[Nos. 55958–9, 55976–7. En Banc. February 22, 1990.]

GREGORY HINES, ET AL, *Petitioners,* v. DATA LINE SYSTEMS, INC., *Defendant,* DONALD E. BARNARD, ET AL, *Respondents.*

GREGORY HINES, ET AL, *Respondents,* v. DATA LINE SYSTEMS, INC., ET AL, *Appellants.*

128

130

*Ferguson & Burdell,* by *W. Wesselhoeft, Phillip S. Miller,* and *Dennis J. Dunphy,* for Hines, et al.

*Riddell, Williams, Bullitt & Walkinshaw,* by *David D. Hoff* and *Howard A. Coleman,* for Barnard, Boin, Cline, and Zirkle.

*Hillis, Clark, Martin & Peterson, P.S.,* by *Louis D. Peterson* and *Joel N. Bodansky,* for Perkins Coie.

*Van Valin & Watts, Inc., P.S.,* by *Victor Van Valin,* for Peterson, Mason, and Morgan.

DORE, J.—Investors[1] in Data Line Corporation who received a stock prospectus advising of the dependency on key personnel, with particular emphasis on the abilities of its President Dale Peterson, claimed in a securities fraud action they should have been informed of Peterson's brain aneurysms and operation, which information was known or should have been known to the underwriters, directors and their attorneys. Two directors and the corporation's attorneys prior to trial were dismissed on summary judgment. The investors went to trial against the remaining directors and underwriters and obtained judgments rescinding stock purchases for violations of the "Washington State Securities Act" (hereinafter State Securities Act). The defendants appealed the trial court decision and six of the eight

---

[1]Investors are Gregory Hines, Arnold Midtskog, Vance Mylroie, Michael Schwartz and their respective marital communities; Robert Arnold, Andrew Mathisen, Richard Swan and William Vieser, d/b/a Circle V Associates Four.

investors cross–appealed.[2] All investors in separate appeals asked the appellate court for reversal of the summary judgments of dismissal against attorneys Perkins Coie and directors Boin and Barnard.

The Court of Appeals certified the trial judge's decision to this court. It took jurisdiction over the two summary judgments from the trial court and affirmed the Perkins Coie dismissal and reversed the dismissal of directors Boin and Barnard and remanded them for trial. Barnard and Boin did not appeal. The investors then petitioned this court to appeal the dismissal of Perkins Coie by the Court of Appeals.

On review, we affirm the trial court's judgments against all defendants, and affirm the Court of Appeals affirmance of the summary judgment of dismissal of Perkins Coie.

We reinstate the causes of action of the four investors who purchased their stock prior to October 15, 1982, who cross–appealed against Cline and Zirkle. We remand to the trial court to determine whether Cline and Zirkle had an affirmative defense pursuant to RCW 21.20.430.

## FACTS

Investors purchased $385,000 worth of stock in Data Line pursuant to a private placement of securities in 1982. Data Line was founded by Dale Peterson and Gary Morgan, former employees of Keytronic Corporation. The company was in the business of developing and marketing a product called an Optical Character Recognition Thought Reader for the banking industry. This product centered around an optical character recognition slot reader developed by Peterson, Morgan and others while they were employed at Keytronic Corporation.

Data Line's management consisted of Peterson who was the chief executive officer, and Morgan who served as the

---

[2]Investors Michael Schwartz and Robert Arnold did not cross–appeal. Clerk's Papers, at 391 (cause 55976–7).

The clerk's papers in the above cause numbers are numbered the same, so it was necessary to differentiate by cause number the applicable clerk's papers.

chief operating officer and executive vice-president, principally responsible for engineering, and Gary Mason.

Donald Barnard, Bruno Boin, and Robert Cline purchased a significant interest in the company and were voted to the board of directors at the first annual meeting in June 1980. In July 1981, Data Line entered into a manufacturing agreement with Keytronic. As part of this transaction, Keytronic purchased a 17.5 percent interest in Data Line. The terms of the purchase included a guaranteed seat on the board of directors for Keytronic's chief executive officer, Lewis Zirkle. Barnard, Boin, Cline and Zirkle were considered outside directors, that is directors that were not officers or involved in the day-to-day operations.

By late 1981, the board of directors determined the continuing viability of Data Line depended upon new financing. The board authorized the officers to enter into an agreement with Evans Llewellyn Securities, Inc., for the sale of stock pursuant to a private placement memorandum (hereinafter placement memorandum). Perkins Coie was retained as legal counsel with respect to the stock offering.

On June 10, 1982, Data Line and Evans Llewellyn circulated the approved placement memorandum which offered for sale 70,000 shares of the company's common stock at $25 per share. Section 9 of Data Line's placement memorandum emphasized the importance of key personnel to the company, stating:

> Dependence Upon Key Personnel. The performance of the Company depends upon the active participation of its officers, including Dale L. Peterson . . . The loss of any of these qualified personnel could have a material adverse effect upon the Company. . . .

Clerk's Papers, at 319 (cause 55958-9).

On June 5, 1982, 5 days before the placement memorandum went into circulation, Peterson was hospitalized in Spokane where he was diagnosed as having an aneurysm[3] in his brain which had burst and bled. On June 7, 1982,

---

[3]An aneurysm is "a localized abnormal dilatation of a blood vessel (as an artery) filled with fluid or clotted blood, usu[ally] forming a pulsating tumor, and

after additional testing, it was discovered Peterson had multiple aneurysms, occurring in both hemispheres in his brain. On June 10, 1982, the day on which the placement memorandum was circulated, Peterson underwent surgery to correct the bleeding aneurysm. All of the directors and Evans Llewellyn were advised of Peterson's bleeding aneurysm before surgery. Perkins Coie was advised by Mason on June 11, 1982. Following surgery, Peterson's doctor advised him that on an elective basis he should within the year undergo a second, similar operation to correct the remaining aneurysms.

Immediately, the question of whether Peterson's health condition and surgery should be disclosed to potential investors in some fashion was discussed. It was decided by Data Line and Perkins Coie that disclosure of Peterson's health problem should be provided to the investors. Perkins Coie documented this decision as follows:

> Gary [Morgan] and I have discussed the possibility of Dale writing a letter to all investors on his health in 30 days, or before the closing. This would both provide full information and reassure investors. Let's plan on it.

Clerk's Papers, at 324 (cause 55958-9).

The planned disclosure was never made. Later Perkins Coie changed its recommendation and advised Data Line that disclosure was unnecessary since Peterson's apparent recovery from his surgery and his early return to work made his health condition irrelevant. Perkins Coie made this recommendation relying upon the observations of Morgan and Mason regarding Peterson's apparent recovery from the surgery and upon firsthand observation of Peterson. Neither Perkins Coie nor any of the directors communicated with any of Peterson's treating physicians nor did they request from Peterson a full disclosure of his medical condition. None of the directors, Perkins Coie, or Evans Llewellyn were aware of Peterson's subsisting aneurysms,

---

resulting from disease of the vessel wall." *Webster's Third New International Dictionary* 82 (1966).

or of the recommendation of Peterson's doctor that he undergo a second brain surgery within the year.

It was not until the middle of October 1982, that Peterson advised the other officers of his decision to undergo a second surgery for the persisting aneurysms. It was only then that the directors became aware of Peterson's additional aneurysms. After Peterson underwent the second surgery, he never effectively resumed his duties and he resigned in April 1983. Data Line made few sales of its products and, in July 1984, the shareholders voted to wind up the corporation's affairs. Data Line's stock is now valueless.

## ANALYSIS

The officers and directors argue that before they can be liable under RCW 21.20.010,[4] the investors must establish that defendants' misrepresentations were the proximate reason for their investments' decline in value. We disagree. The investors need only show that the misrepresentations were material and that they relied on the misrepresentations in connection with the sale of the securities. Findings of fact 2.24 through 2.32 to which directors have not assigned error and are therefore verities substantiate that each investor relied on statements in the selling materials with respect to the importance of Peterson, the chief executive officer, to the company. Conclusion of law 3.2, to which directors have not assigned error, finds Peterson's health condition after the first surgery to be a material fact.

■ A plain reading of the State Securities Act demonstrates that a decline in the market value of the stock is not an element of a State Securities Act claim. RCW 21.20.010

---

[4]RCW 21.20.010 provides in relevant part:

"It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

". . . .

"(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; . . .".

makes it unlawful for a seller to make a material misrepresentation or omission in connection with the sale of a security. The violation is in the misrepresentation itself; it is not how the misrepresentation affected the price of the stock. RCW 21.20.430(1) provides rescission as the basic remedy. Thus an investor who is wrongfully induced to purchase a security may recover his investment without any requirement of showing a decline in the value of the stock. We affirm the trial court's finding that investors are not required under the State Securities Act to prove that Peterson's health condition caused the decline in value of Data Line's stock.

Investors contend the outside directors Cline and Zirkle are secondarily liable to them. RCW 21.20.430(3)[5] imposes secondary liability on control persons and directors for a seller's violation of RCW 21.20.010. Conclusion of law 3.8, to which directors have not assigned error, finds Data Line violated the State Securities Act.

### CONTROL PERSON

This court has not heretofore formulated a test for determining when a person may be deemed a control person for purposes of RCW 21.20.430(3). Under analogous federal law, the control person doctrine is based on section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) and section 15 of the Securities Act of 1933, 15 U.S.C. § 77o.[6] The Securities and Exchange Commission has defined "control" as follows:

---

[5]RCW 21.20.430(3) in relevant part provides:

"Every person who directly or indirectly controls a seller or buyer liable under subsection (1) or (2) above, every partner, officer, director or person who occupies a similar status or performs a similar function of such seller or buyer, every employee of such a seller or buyer who materially aids in the transaction, and every broker–dealer, salesperson, or person exempt under the provisions of RCW 21.20.040 who materially aids in the transaction is also liable jointly and severally with and to the same extent as the seller or buyer . . .".

[6]Section 20(a) provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person . . .

> The term "control" . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

17 C.F.R. § 230.405(f) (1980). *G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 957 (5th Cir. 1981).

The federal courts, in interpreting section 20(a) of the Securities Exchange Act of 1934 and section 15 of the Securities Act of 1933 are split on what standards govern control person liability.

Several circuits have adopted a 2–prong test introduced in *Metge v. Baehler,* 762 F.2d 621, 631 (8th Cir. 1985), *cert. denied,* 474 U.S. 1057 (1986), requiring the plaintiff to

> establish, first, that the defendant . . . "actually participated in (*i.e., exercised* control over) the operations of the corporation in general; then he must prove that the defendant possessed the *power to control* the specific transaction or activity upon which the primary violation is predicated, but he need not prove that this later power was exercised."

This test distinguishes "between actual exercise of control in the violator's principal affairs and potential control over the violation." (Some italics ours.) *Metge,* at 631.

Other courts have applied a more rigorous test requiring "culpable participation" in the violation. *See, e.g., Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 889–90 (3d Cir. 1975); *Orloff v. Allman,* 819 F.2d 904, 906 (9th Cir. 1987). *Metge* rejected the more stringent *Rochez* test because the plain language of the statute does not require participation in the wrongful transaction. *Metge,* at 631. Additionally, the court noted that

---

unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

Section 15 provides: "Every person who, by or through stock ownership, agency, or otherwise, . . . controls any person liable under . . . this title, shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o.

good faith and lack of participation are affirmative defenses in a controlling person action, and requiring them as part of the plaintiff's prima facie case while allowing them as affirmative defenses, confuses the parties' responsibilities and unnecessarily burdens plaintiffs contrary to the plain meaning of the statute.

*Metge*, at 631. *See also Drobbin v. Nicolet Instrument Corp.*, 631 F. Supp. 860, 885 (S.D.N.Y. 1986) (good faith and culpable participation are part of statutory defense).

■ Under the plain language of RCW 21.20.430(3), the investors need show only that the defendant "directly or indirectly control[led] [the] seller". The statute does not require the plaintiff to prove that the defendant "culpably participated" in the alleged violation. Instead, the statute clearly shifts the burden onto the defendant to prove that "he or she did not know, and in the exercise of reasonable care could not have known" of the liability--producing facts.

Nonetheless, even under the more demanding "culpable participation" test, the evidence before us demonstrates the outside directors were controlling persons. The trial court record demonstrates the directors did not merely sit on the board of directors, as defendants allege, but were, from the beginning, influential participants on a board actively involved in directing the management, especially the financial endeavors, of Data Line.

Boin, Barnard and Cline were elected to the board at Data Line's first annual meeting. They were initial investors in the company, each investing $83,333 and each holding 11 percent of Data Line's outstanding stock. Zirkle obtained membership on the board in July 1981 as part of the agreement between Data Line and Keytronic Corporation, whereby Keytronic purchased 17.5 percent of Data Line's stock.

Besides having a sizable equity interest in Data Line, Data Line's success was important to Keytronic for other reasons. Data Line's success would also mean success for Keytronic because Data Line's product utilized a Keytronic product, a slot reader, which had not yet experienced much

profit. The importance of Data Line's success to Keytronic was highlighted by Zirkle:

> Q. The next sentence says, "Keytronic which has traditionally served as an OEM custom 'job shop', regards DLS as its first viable product diversification effort, coupling the proprietary OCR slot reader developed by Morgan and Peterson while at Keytronic with a highly competitive automated teller terminal and automated proof machine."
> Would that be a correct statement?
>
> . . . .
> A. Basically.

Report of Proceedings, at 52–53 (June 2, 1987). Testimony of Lewis Zirkle.

Prior to the offering the outside directors as a group held 50.5 percent of the stock in Data Line. The outside directors, by virtue of their significant management skills and experience, dwarfed the business backgrounds of officers Peterson and Morgan. Barnard was founder and president of Seattle Packaging Company since 1967. Boin was a consulting actuary and a partner in the firm of Milliman and Robertson, Inc. Zirkle was founder and chief executive officer of Keytronic. Cline was the vice–chairman and chief financial officer of Airborne Freight Corporation. Furthermore, Cline had a wealth of experience with respect to stock offering and capitalization of corporations.

Not only were the outside directors in a position to control the company, the evidence demonstrates that they did. For example, the outside directors made decisions as to whether and when new product lines could be pursued by the company:

> Q. And do you see on page 2 the last paragraph before the comment that the meeting was adjourned where it reads "John Mason made a motion that the board discuss lifting the restriction placed on the operating people at its January 16, 1981 meeting relating to money and resources on new product areas."
>
> . . . .
> Q. Does that refresh your recollection as to what really occurred at that earlier meeting was that the outside directors told the officers really to halt that initiative?
> A. I think it relates very closely to what I told you.

Q. It says restriction was placed on the operating people. That doesn't suggest to you that the outside directors were telling the officers not to go ahead in the earlier board meetings?
A. No, it suggests to me that we discussed it together and decided together not to do it.

. . . .
Q. "Bob Cline made the motion to allow management to take the necessary steps to direct the company along these lines as long as no new resources and capital were required to do so over the next six months."
Do you assign any significance to the fact that it is Bob Cline that made the motion and that the term that is used is "allow management"?
A. No, I don't.
Q. So, your testimony is that the restriction was not placed by the outside directors?
A. My contention is that we did it together.

Report of Proceedings, at 114–15 (May 28, 1987). Testimony of Donald Barnard.

As another example, the outside directors insisted upon revisions of the proposed Working Agreement with Keytronic, as illustrated by the minutes of a board meeting:

Q. . . . "After considerable and vigorous discussion, particularly on sections 2 and 3 of this plan, it was agreed that those sections would be rewritten along the lines that were suggested by Bob Cline, a handwritten copy of which was given to Gary Morgan."

Report of Proceedings, at 121 (May 28, 1987).

With respect to the alleged failure to inform investors of significant information, the directors contend that they had nothing to do with the preparation of the placement memorandum, other than sitting on the board. The evidence, however, demonstrates the outside directors were involved from the beginning in the financial planning of the company and were major players in the negotiations leading up to and including drafting and circulation of the placement memorandum.

Board minutes in January 1982 reflect the discussion of how to satisfy the company's financial requirements of from 1.5 to 2 million dollars over the next 18 months. At a February 1982 board meeting, the minutes reflect that the

proposal of Evans Llewellyn was discussed and significant changes were recommended.

Furthermore, Cline's deposition demonstrates the directors reviewed underwriters' proposals and that they limited the officers regarding the terms of the underwriting agreement:

Q. Do you recall reviewing proposals from Evans Llewellyn prior to actually authorizing Data Line to enter into a best efforts selling agreement?

A. Yes.

Q. Can you recall with respect to Exhibit No. 11, the March 4th letter, which is signed as agreed to by—it looks like John Mason—whether this letter was reviewed by the board prior to the board authorizing Mr. Mason to sign it?

A. I can't specifically say that we authorized this letter; but we did, as a board, authorize management under certain constraints that we had, as a board, agreed to develop, to sign this type of document with Data Line.

Clerk's Papers, at 391 (cause 55958–9). Deposition of Robert Cline.

Not only did the directors review the placement memorandum but they were cognizant of their responsibility in doing so:

Q. Okay. The first item I want to ask you about is the overview of the private placement memorandum. Do you recall the substance of what [Perkins Coie attorney] had to say about overviewing the private placement memorandum?

A. That's my recollection. He said that we had, we as directors, had responsibility to review the memorandum or any other material that was going to be reaching potential investors from the standpoint of was it correct or materially misleading or misleading by omission.

Clerk's Papers, at 399 (cause 55958–9). Deposition of Robert Cline.

Cline stated that the board of directors reviewed a number of drafts of the placement memorandum before it was finalized. The directors then reviewed several drafts of the placement memorandum which attested to Peterson's good health. The directors in fact knew of Peterson's aneurysm and initial surgery before a single sale had taken place.

However, none of the directors disclosed or sought to disclose material facts about Peterson's persistent medical condition in an addendum to the placement memorandum.

In the record before us, we do not discern any attempt by a director to oppose the nondisclosure of Peterson's health to the investors. They obviously condoned and participated in the misrepresentation about Peterson's health. *See Metzger v. American Food Mgt., Inc.*, 389 F. Supp. 469, 471 (W.D. Pa. 1975) (directors in position of control failed to prevent fraud in selling worthless securities found to culpably participate in violation). Further, the directors' knowledge of the placement memorandum and Peterson's initial surgery, and their presence at board meetings at which the placement memorandum was thoroughly discussed, is adequate evidence that the directors culpably participated in the violation. *See Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793, 804 (3d Cir. 1978) (directors' knowledge of illegal note program and their presence at board meetings at which the program was considered sufficient proof that the directors "culpably participated" in the control person's unlawful activity).

In conclusion, the evidence demonstrates the outside directors as a group had clear control over Data Line at the time of the offering. In the aggregate, the outside directors held a majority of the stock and each had invested substantial sums of money into the company. In addition, they were an active group who directed and influenced the management of the company. Further, the directors, by virtue of their presence at board meetings where the placement memorandum was fully discussed and their knowledge of Peterson's initial surgery, participated in the omission of material facts from the placement memorandum.

We hold that the trial court's decision can be sustained against directors Cline and Zirkle on a control person basis. Independent of that, however, we believe that such judgments against them could also be affirmed based upon violations of the State Securities Act under RCW 21.20-.430(3), by virtue of their status as directors.

## DIRECTOR LIABILITY

■ The directors in putting forth the placement memorandum had a duty to disclose information about Peterson's health. In failing to put this information in the selling document, the seller, Data Line and its directors violated the statute by omitting a material fact. RCW 21.20.430(3) expressly makes all directors of an issuing corporation liable to the same extent as the seller who violates the State Securities Act, subject to the due diligence defense which each director bears the burden of proving:

> Every person who directly or indirectly controls a seller or buyer liable under subsection (1) or (2) above, every partner, officer, *director* or person who occupies a similar status or performs a similar function of such seller or buyer, every employee of such a seller or buyer who materially aids in the transaction . . . is also liable . . . to the same extent as the seller or buyer . . ..

(Italics ours.) RCW 21.20.430(3).

The statute clearly does not distinguish between "inside" and "outside" directors, and liability may exist without control person status. While no Washington case directly addresses the specific language in question, the courts of several other states with Blue Sky laws substantially identical to Washington's have addressed this precise question and have concluded that the plain language should be given its obvious meaning.

In *Foelker v. Kwake*, 279 Or. 379, 386, 568 P.2d 1369 (1977), an officer/defendant argued that the evidence did not demonstrate her participation in any of the illegal transactions. The court, in interpreting liability for the nonparticipating officer under the Oregon statute with near identical language to RCW 21.20.430(3), responded:

> [N]o such personal participation need be proved to impose liability, it being sufficient that the defendant was an officer of the corporation . . ..

Similarly, in *Arnold v. Dirrim*, 398 N.E.2d 426, 433–34 (Ind. Ct. App. 1979), the court interpreted a substantially identical statute to RCW 21.20.430(3) stating:

From a grammatical standpoint, with due regard for punctuation, it seems apparent that this statutory provision imposes absolute liability upon the director of a corporation . . . based on his position as a director unless he proves the statutory defense.

The courts of New York, Michigan, Kansas and Arkansas have interpreted their state securities laws to the same effect. *See Taylor v. Perdition Minerals Group, Ltd.*, 244 Kan. 126, 766 P.2d 805, 810 (1988) (strict director liability is imposed unless the statutory defense of lack of knowledge is proven). *See Moerman v. Zipco, Inc.*, 302 F. Supp. 439 (E.D.N.Y. 1969) (statute imposes liability on an employee of a seller only if he materially aids in the sale but puts no similar restrictions on the liability of a director); *Rzepka v. Farm Estates, Inc.*, 83 Mich. App. 702, 269 N.W.2d 270 (1978) (where defendants failed to establish their lack of knowledge they were liable in their positions as directors of the corporation). *Mitchell v. Beard*, 256 Ark. 926, 513 S.W.2d 905 (1974) (while an employee must materially aid in the sale before he becomes liable, that requirement is not applicable to a partner).

RCW 21.20.430(3) can be read to impose derivative liability on those persons who are directors, without reference to control person status. It is well settled that when the language of a statute is clear and unambiguous there is no room for judicial construction. *Roza Irrig. Dist. v. State*, 80 Wn.2d 633, 497 P.2d 166 (1972). If it were the intent of the Legislature to impose liability on directors only if they were control persons, the statute could have left out directors altogether. Instead the statute imposes liability on separate classes of individuals, independent of each other, unless they can prove the affirmative defense of no knowledge.

In sum, there is substantial evidence in the record to uphold the trial court's finding that Cline and Zirkle are liable pursuant to RCW 21.20.430(3) either as controlling persons or directors of Data Line subject to the affirmative defense.

Affirmative Defense
Cline and Zirkle

The State Securities Act provides a defense to liability if:

> such person sustains the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

RCW 21.20.430(3). The trial court in interpreting this provision concluded that:

> The standard used in determining whether or not a director has satisfied the "reasonable care" defense provided in RCW 21.20.430(3) is that contained in the Washington Business Corporation Act, RCW 23A.08.343(1);[7] that is, he may rely on information, opinions, reports, or statements prepared or presented by one or more officers of the corporation whom the director believes to be reliable and competent in the matter presented.

Clerk's Papers, at 293 (cause 55976–7). Conclusion of law 3.4.

■■ We agree with the investors that the trial court erred in using this standard. The trial court's construction of these statutes would render the provisions of the State Securities Act defense meaningless in deference to the "Washington Business Corporation Act" (hereinafter Corporation Act) standard for director liability. By its plain words, the defense provision of the State Securities Act requires affirmative action on the part of a director who wishes to avail himself of this defense. In contrast, the Corporation Act sanctions a passive, good faith, lack of knowledge defense. The Legislature has not indicated that it meant to apply the standard of care for director liability to the reasonable care defense in security violation cases. Furthermore, the purposes of the Corporation Act and the State Securities Act are entirely different, suggesting that an identical standard of care should not be applied to each statute. RCW 23A.08.343 is a codification of the "business

---

[7]RCW 23A.08.010 through RCW 23A.08.500 have been repealed by Laws of 1989, ch. 165, § 204 (effective July 1, 1990), and are recodified under RCW Title 23B.

judgment rule". *Schwarzmann v. Association of Apartment Owners,* 33 Wn. App. 397, 655 P.2d 1177 (1982). The purpose for this rule allows the corporation to function effectively by allowing those having management responsibility the freedom to make in good faith the many necessary decisions quickly and finally without the impairment of having to be liable for an honest error in judgment. *Financial Indus. Fund, Inc. v. McDonnell Douglas Corp.,* 474 F.2d 514, 518 (10th Cir. 1973).

On the other hand, the purpose of the State Securities Act endeavors to protect *investors;* to this end this court has construed the State Securities Act broadly. *Haberman v. WPPSS,* 109 Wn.2d 107, 126, 744 P.2d 1032, 750 P.2d 254 (1987), *appeal dismissed,* 488 U.S. 805, 102 L. Ed. 2d 15, 109 S. Ct. 35 (1988). The two statutes address different problems. This court will not read into the clear language of RCW 21.20.430(3) the standard found in RCW 23A.08-.343. *See Everts v. Holtmann,* 64 Or. App. 145, 667 P.2d 1028, 1035 (court in reviewing similar Corporation Code concluded that compliance sheltered a director from liability to the corporation but not from investors with a security claim), *review denied,* 296 Or. 120 (1983); *Arnold v. Dirrim,* 398 N.E.2d 426 (Ind. Ct. App. 1979).

Finally, it is important to note that RCW 23A.08.343 provides a standard of care for directors only. *Para–Medical Leasing, Inc. v. Hangen,* 48 Wn. App. 389, 739 P.2d 717 (1987). Because the defense in the State Securities Act does not distinguish between directors, officers, control persons or employees, it would be incongruous to apply a different standard of care to directors. For example, an officer who is also a director would have a lesser standard of care than an officer who is not a director; and all directors would have a lesser standard of care than employees, officers or control persons. This does not make sense in the securities context, where the State Securities Act is to be broadly construed in order to maximize protection for the investing public. *Haberman,* at 126; *McClellan v. Sundholm,* 89 Wn.2d 527, 533, 574 P.2d 371 (1978).

Defendants argue, notwithstanding the application of RCW 23A.08.343, the State Securities Act "reasonable care" defense does not impose upon directors a duty to investigate facts beyond their *actual* knowledge. However the plain language of the affirmative defense provision requires something more than actual knowledge. The defense is available only if such person "did not know" and "could not have known" of the existence of the liability producing facts. Ignorance will be bliss only to the extent that the director can prove that even by the exercise of reasonable care he would have remained ignorant of the true state of affairs. *Robertson v. White,* 635 F. Supp. 851, 865 (W.D. Ark. 1986). The defendant, at a minimum, must apprise himself of facts reasonably within his grasp. The question presented is whether the outside directors in the exercise of reasonable care could have known of Peterson's remaining aneurysms, not whether they actually knew.

We conclude the Corporation Act standard of director duties does not apply to the State Securities Act defense. The clear language of RCW 21.20.430(3) imposes upon directors the burden of affirmatively proving that in the exercise of reasonable care they could not have learned of Peterson's remaining aneurysms. We reverse the trial court's finding that directors Cline and Zirkle met their burden under the affirmative defense, as to those investors who purchased stock prior to October 15, 1982, by relying on statements of the officers. We remand to the trial court to determine whether Cline and Zirkle met their burden pursuant to this court's interpretation of RCW 21.20-.430(3).

## LIABILITY OF CORPORATE OFFICERS

The officers argue they may avoid liability by relying on the advice of their attorneys. They assign error to the trial court's conclusion:

> [that] [a] director who has knowledge of facts which are ultimately deemed to be material cannot escape liability under the Washington State Securities Act by relying on the advice of

an attorney to the effect that those facts are not material and/ or need not be disclosed.

Clerk's Papers, at 295 (cause 55976–7). Conclusion of law 3.13.

 Reliance on counsel regarding the materiality of facts does not sustain the officer's burden of proof that he didn't know of the *existence of the facts* by reason of which liability is alleged to exist. The statute makes no reference to knowing about the *materiality* of a fact, but merely the *existence* of certain facts. We agree with the Court of Appeals that a director cannot "wash his hands of all corporate decisions particularly when he has access to the same facts as counsel did in the case at hand." *Hines v. Data Line Sys., Inc.*, 53 Wn. App. 283, 293, 766 P.2d 1109, *review granted*, 112 Wn.2d 1016 (1989). The State Securities Act imposes liability on those who know the facts without regard to whether the law deemed those facts material.

Other jurisdictions also support this holding. *See Arnold v. Dirrim*, 398 N.E.2d 426, 435 (Ind. Ct. App. 1979) (the statute imposes liability on those who know the applicable facts without regard to the knowledge of the law); *Marshall v. Harris*, 276 Or. 447, 555 P.2d 756 (1976) (good faith and even reliance upon advice of counsel is not a defense); *Robertson v. White*, 635 F. Supp. 851, 867 (W.D. Ark. 1986) (ignorance of the law, and of its characterization of a given transaction is irrelevant).

We affirm the trial court's judgment against Peterson, Morgan and Mason. Their reliance on counsel regarding the materiality of facts does not sustain their burden under the affirmative defense provision of RCW 21.20.430(3).

Summary Judgment Dismissal of Perkins Coie

Investors contend Perkins Coie, in its role as counsel for Data Line's stock offering, can be vicariously liable as seller, control person, director or employee and should not have been dismissed at summary judgment.

■ The task before us is to ascertain whether the trial court correctly granted a motion for summary judgment. In reviewing a summary judgment motion, we can only look to the evidence in the record before the trial court at the time the motion was made.

A summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). The moving party bears the initial burden of showing "there is an absence of evidence to support the nonmoving party's case." *Young v. Key Pharmaceuticals, Inc.,* 112 Wn.2d 216, 225 n.1, 770 P.2d 182 (1989) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to his case then the trial court should grant the motion. *Young,* at 225.

■ After reviewing the evidence, we conclude the investors failed to put forth sufficient evidence demonstrating that Perkins Coie occupied the status of seller, control person, director, or employee to raise an issue of material fact. In *Haberman v. WPPSS,* 109 Wn.2d 107, 744 P.2d 1032, 750 P.2d 254 (1987), *appeal dismissed,* 488 U.S. 805, 102 L. Ed. 2d 15, 109 S. Ct. 35 (1988), we held "a defendant is liable as a seller under RCW 21.20.430(1) if his acts were a substantial contributive factor in the sales transaction." *Haberman,* at 131. Factors to be considered in determining whether a defendant's conduct is a substantial contributive factor in the sales transaction include:

(1) the number of other factors which contribute to the sale and the extent of the effect which they have in producing it; (2) whether the defendant's conduct has created a force or series of forces which are in continuous and active operation up to the time of the sale, or has created a situation harmless unless

acted upon by other forces for which the actor is not responsible; and (3) lapse of time.

*Haberman,* at 131–32.[8]

Other jurisdictions considering the liability of professional advisors under a substantial factor test distinguish between those advisors whose role is confined to rendering routine professional services in connection with an offer, and active participation in the sales transactions. *Ahern v. Gaussoin,* 611 F. Supp. 1465, 1485 (D. Or. 1985); *In re Activision Sec. Litig.,* 621 F. Supp. 415, 420–21 (N.D. Cal. 1985).

Investors concede that in order to impose seller liability on counsel under *Haberman* "something more" must be shown than performance of the usual drafting and filing services provided by counsel. This "something more" is the advice Perkins Coie rendered regarding the materiality of Peterson's health. They argue this advice at least raises a question of fact as to whether Perkins Coie's role was a substantial contributive factor in the sales process. We disagree.

In connection with the actual offering process, there is no evidence to indicate Perkins Coie had any personal contact with any of the investors or was in any way involved in the solicitation process. Instead, the actions of Evans Llewellyn and the directors had the predominant effect of bringing about the sale. Data Line and Evans Llewellyn conducted the sales transactions beginning with distributing the placement memorandum to securing sales closings with interested investors. In any event, advice by

---

[8]The Court of Appeals concurring judge in *Hines v. Data Line Sys., Inc., supra,* suggests that this court may want to reconsider the rule in *Haberman,* in light of the recent Supreme Court case of *Pinter v. Dahl,* 486 U.S. 622, 100 L. Ed. 2d 658, 108 S. Ct. 2063 (1988), which rejected the "substantial contributive factor" test. However, this court has already reconsidered this issue and decided to maintain the "substantial contributive factor" test in interpreting the term "seller". *See Hoffer v. State,* 113 Wn.2d 148, 151–52, 776 P.2d 963 (1989).

counsel to an issuing company about the materiality of certain facts is the rendering of routine professional legal services in connection with an offer. The advice given by Perkins Coie to Data Line was not a catalyst in the sales transaction between Data Line and the investors.

We agree with the Court of Appeals that "Perkins Coie's participation in the sales transaction is insufficient under the *Haberman* test to constitute a 'seller' for purposes of RCW 21.20.430(1)." *Hines,* 53 Wn. App. at 289. We also agree with the Court of Appeals that the investors have failed to present evidence sufficient to create a factual issue as to control person, director, or employee status on the part of Perkins Coie.

Investors further contend that Perkins Coie was guilty of negligent misrepresentation. The elements of a cause of action for negligent misrepresentation are taken from the Restatement (Second) of Torts § 552(1) (1977), which provides:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Haberman,* at 161–62. Liability for negligent misrepresentation is limited to cases where:

> (1) the defendant has knowledge of the specific injured party's reliance; or (2) the plaintiff is a member of a group that the defendant seeks to influence; or (3) the defendant has special reason to know that some member of a limited group will rely on the information.

*Haberman,* at 162–63.

The facts before the trial court demonstrate at the time Perkins Coie prepared the placement memorandum, it contained no misstatement regarding Peterson's health. Peterson's first surgery did not occur until after Perkins Coie's work on the placement memorandum had been completed and the document had been transmitted to the selling

agent. Perkins Coie had no knowledge of the existence of the second aneurysm until well after the offering. Furthermore, there is no evidence that Perkins Coie intended this information to influence or reach a particular class distinct from the general investing public who would have access to the information and rely upon it. We conclude that the investors failed to establish the existence of an essential element to their claim for negligent misrepresentation. We affirm the trial court's summary judgment dismissal of Perkins Coie.

Liability of Evans Llewellyn

Evans Llewellyn assigns error to the trial court's conclusion that it violated RCW 21.20.430(3) as to plaintiff Schwartz. Clerk's Papers, at 295 (cause 55976-7). Conclusion of law 3.10. Schwartz paid $50,000 for his stock on November 29, 1982, and the stock purchase closed on January 11, 1983. Prior to the close of the sale, Schwartz was unaware of either of Peterson's surgeries.

RCW 21.20.430(3) makes an underwriter liable unless it proves that it did not know, and in the exercise of reasonable care could not have known of the existence of the facts on which the liability was based. Evans Llewellyn is liable unless it proves that in the exercise of reasonable care it could not have learned of the remaining aneurysms before January 11, 1983.

Evans Llewellyn argues that the plaintiffs have failed to show that it actually learned of the remaining aneurysms before January 11, 1983. Evans Llewellyn's argument misses the point. First, it is not plaintiff's burden to prove whether or not defendants had knowledge of the facts in question. Secondly, lack of actual knowledge is not the end of defendant's burden as described above. In addition, it is defendant's burden to demonstrate that in the exercise of reasonable care it could not have known about the liability producing facts. Here, Evans Llewellyn offers no evidence to demonstrate that it could not have known of Peterson's remaining aneurysms. It merely relies on the fact that

investors failed to show when Evans Llewellyn learned of Peterson's second operation.

In light of the fact that Peterson underwent his second craniotomy on December 7, 1982, and the fact that all the directors knew about this second surgery, Peterson's health condition could have easily been discovered before the close of the sale to Schwartz on January 11, 1983. We affirm the trial court's judgment against Evans Llewellyn as to plaintiff Schwartz.

## CONCLUSION
### Appeal

1. We affirm the trial court judgments for the investors against defendant officers Peterson, Mason, Morgan.[9]

2. We affirm the trial court judgments for the investors against defendant directors Cline and Zirkle.

3. We affirm judgment against Evans Llewellyn in favor of Schwartz.

4. We affirm judgment for attorney fees plus interest, together with its allocation against the various defendants.

5. We affirm the Court of Appeals decision in upholding the summary judgment of dismissal against Data Line's attorneys Perkins Coie.

### Cross Appeal

We reverse the trial court decision in dismissing the causes of action of investors purchasing Data Line stock prior to October 15, 1982, against Zirkle and Cline. Such investors' causes of action shall be remanded to the trial court for the purpose of determining whether directors

---

[9]The trial court also awarded an alternative judgment to the judgments awarded under the State Securities Act in favor of the investors against Peterson, Mason and Morgan. The trial court based these judgments on common law negligence. Clerk's Papers, at 298 (cause 55976–7). Conclusion of law 3.17. The officers did not assign error to this conclusion, nor did they argue that they should not be held liable under common law negligence. Appellate courts will only review claimed error which is included in an assignment of error. *Bender v. Seattle*, 99 Wn.2d 582, 599, 664 P.2d 492 (1983). Thus, the alternative judgment must be upheld as well.

Zirkle and Cline are entitled to an affirmative defense consistent with the provisions of this opinion. If such directors fail to prove an affirmative defense, the trial court is directed to enter judgment in the amount of the purchased stock plus a reasonable attorney fee in favor of investors against Cline and Zirkle.

Respondents/cross appellants shall be awarded costs and attorney fees for their appellate work in a reasonable amount as determined by the trial court.

CALLOW, C.J., UTTER, BRACHTENBACH, DOLLIVER, DURHAM, and SMITH, JJ., and PEARSON, J. Pro Tem., concur.

ANDERSEN, J., concurs in the result.

Reconsideration denied May 31, 1990.