47 P.3d 567 (2002)
111 Wash.App. 824
Herbert HERRINGTON and Jean Herrington, husband and wife, and their marital community; Glenn Kramer, Kay Kagey, and Jewel Armstrong, on behalf of themselves and all similarly situated, Appellants,
v.
DAVID D. HAWTHORNE, CPA, P.S., a Washington professional service corporation; David D. Hawthorne and Jane Doe Hawthorne, husband and wife, and their marital community; Tollefsen & Company P.C. Business Lawyers, an Oregon corporation; John Tollefsen and Jane Doe Tollefsen, husband and wife, and their marital community; Robert A. Kaye and Jane Doe Kaye, husband and wife, and their marital community; John A. Duke as trustee of the John A. Duke Trust and John A. Duke and Jane Doe Duke, husband and wife, and their marital community; Sandra Kintner and William Kintner, husband and wife, and their marital community, Respondents.
No. 47962-8-I.
Court of Appeals of Washington, Division 1.
May 20, 2002.
As Amended June 24, 2002.
As Amended on Denial of Reconsideration August 13, 2002.
*569 Charles Kenneth Wiggins, Kenneth Wendell Masters, Bainbridge Is, David R. Major, Mark Adam Griffin, Seattle, for Appellants.
Steven Anthony Rockey, Mary C. Eklund, Seattle, for Respondent (Hawthorne and Kaye).
Douglas Wayne Purcell, Kokie Elizabeth Adams, Lynnwood, Ilene A. Lund, Seattle, for Respondent (Duke).
COX, A.C.J.
At issue is the propriety of the summary dismissal of a civil conspiracy claim and claims under the Washington State Securities Act (WSSA) by investors against John A. Duke. We hold that Duke was neither a control person nor a partner of a seller under RCW 21.20.430(3). Thus, he was not secondarily liable under the WSSA. There are genuine issues of material fact regarding whether Duke, who was not a partner in the companies issuing the allegedly fraudulent securities at issue, was a "seller" under RCW 21.20.430(1). Likewise, there are genuine issues of material fact whether Duke participated in a civil conspiracy related to the sale of allegedly fraudulent securities by his business associate and good friend Philip Harmon. We affirm in part and reverse in part.
These claims originated in a "Ponzi" scheme[1] that Harmon perpetrated. Through his companies Northwest Investment Company (NIC), Island Trust, Island Mortgage Company (IMC), and National Friends Investments (NFI), Harmon sold promissory notes to investors. He used the proceeds of later investors to pay earlier investors until the scheme collapsed. Harmon transferred the proceeds from the sales freely among the companies he controlled. Duke was a partner in some companies, including EBC Associates and Marvel Enterprises, but not in others.
In 1997, the U.S. Attorney began a criminal proceeding against Harmon and the entities he controlled, including Marvel Enterprises. Harmon and his accountant, Michael Cheesman, pled guilty to conspiracy to defraud more than 230 people of more than $16 million.
In 1998, the investors who are plaintiffs in this suit sued Harmon in federal court, and received settlements totaling $7 million. Duke was not a defendant in that case. In this lawsuit the investors attempt to recover from Duke the balance of the money they lost by investing in companies in which Duke was not a partner.
*570 Duke moved for summary judgment on two bases. The court denied the motion on one basis, and granted it on the other. We only address the basis on which the court granted summary judgment.

SELLER LIABILITY UNDER WASHINGTON SECURITIES ACT
Herrington first argues that there are genuine issues of material fact whether Duke is liable as a seller under RCW 21.20.430(1). He argues that Duke's actions, including giving Harmon his financial statements and power of attorney, talking to investors about their investments, and failing to stop Harmon from selling securities even after he knew or had reason to know that the Harmon companies were unstable, were substantial contributing factors to the fraudulent sales. We agree. These disputed facts determine whether Duke substantially contributed to the sales, whether other factors were more relevant, and whether Duke set in motion forces that caused the sales.
We may affirm an order granting summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[2] All facts and reasonable inferences must be considered in the light most favorable to the nonmoving party.[3] We review questions of law de novo.[4] A material fact is one upon which the outcome of the litigation depends.[5] Summary judgment is proper when reasonable minds could reach but one conclusion regarding the material facts.[6]
RCW 21.20.430(1) provides that:
Any person, who offers or sells a security in violation of any provisions of RCW 21.20.010, 21.20.140(1) or (2), or 21.20.180 through 21.20.230, is liable to the person buying the security from him or her,....
In Haberman v. Washington Public Power Supply System,[7] our Supreme Court interpreted this statute. The defendants in Haberman included the Supply System, the members and "participants" of the Supply System, and the professionals who rendered services to the Supply System in connection with the securities sales.[8] The Supply System sold securities related to nuclear power plants to underwriters who then sold them to investors. The plants were not built and litigation ensued.
At issue in Haberman was the scope of liability under the state securities laws. Our Supreme Court rejected the "strict privity" approach that has since been adopted by the U.S. Supreme Court and other jurisdictions in favor of a "substantial factor-proximate cause" analysis.[9] Thus, liability under the WSSA is not limited to one who sells securities. Rather, one may be liable as a seller under the statute if one's acts were a "substantial contributive factor" in the sales transaction.[10] The Haberman court listed three factors for a court to consider in determining whether a defendant's conduct was a substantial contributing factor in the sales transaction:
*571 (1) the number of other factors which contribute to the sale and the extent of the effect which they have in producing it;
(2) whether the defendant's conduct has created a force or series of forces which are in continuous and active operation up to the time of the sale, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; and
(3) lapse of time.[[11]]
The court cited to the Restatement (Second) of Torts, § § 432 and 433 for these factors. Subsection 433 discusses "Considerations Important in Determining whether Negligent Conduct is Substantial Factor in Producing Harm." Restatement § 432 states that an actor's negligent conduct is not a substantial factor in bringing about harm if the harm would have been sustained even if the actor had not been negligent, but that an actor's negligence can be a substantial factor, even if there is another, independent, force actively operating to cause the harm, if the actor's negligence would suffice to cause the harm on its own.
The court explained that the substantial contributive factor analysis expands the strict privity analysis to include those who "have the attributes of a seller" and who "policy dictates should be subject to liability under RCW 21.20.430(1), but who would escape primary liability for want of privity."[12] Whether a defendant's conduct was a substantial contributive factor is necessarily a question of fact.[13]
Our Supreme Court applied this test in Hines v. Data Line Systems, Inc.[14] There, the investors in Data Line Corporation received a stock prospectus advising of the company's dependency on key personnel, with particular emphasis on the abilities of its president. They were never informed about the president's brain aneurysms and subsequent operation. Information about the president's health was known or, they alleged, should have been known to the underwriters, directors, and their attorneys. One of the defendants in the case was the law firm that advised the company regarding the decision whether or not to disclose information about the president's health. The court held that a law firm rendering routine professional services to a company issuing securities was not a "seller" under the statute.[15] The court pointed out that there was no evidence that the law firm had any personal contact with any of the investors or was in any way involved in the solicitation process. The court stated that others' actions were predominantly responsible for the sales. The court found that the company, Data Line, "conducted the sales transactions beginning with distributing the placement memorandum to securing sales closings with interested investors" and that the law firm's advice to Data Line "was not a catalyst in the sales transaction."[16]
Here, considering the facts and reasonable inferences drawn from them in the light most favorable to Herrington, the nonmoving party,[17] the record reflects that Duke provided Harmon with a general power of attorney and his financial statements for use in the conduct of business.
Investor Karen Leggee and her husband spoke with Duke on several occasions. Harmon offered to show them Duke's financial statement in an attempt to convince them to invest with him. They were "reassured that [their] investments would be safe and secure because of the personal wealth of Mr. Duke."
Investor Peggy J. Lee spoke with Duke "on several occasions," "over the years." Harmon provided her with a copy of Duke's financial statement.
*572 Investor Jack A. Menashe invested in Marvel after Harmon told him that Duke was a very wealthy individual who would guarantee repayment of his promissory note. Both Harmon and Duke personally guaranteed the promissory note. Harmon executed the personal guarantee for Duke as his attorney-in-fact. Menashe then invested personally in Harmon's companies. Menashe believed that Duke would not permit Harmon to sign notes for him as his attorney-in-fact unless Harmon's note sales were legitimate.
Investor Herbert Herrington declared that Harmon's representations about his relationship with Duke helped convince him and his wife that their investments would be safe and secure. Harmon gave them a copy of Duke's financial statement. They received a "Personal Indemnification Agreement" from Harmon and Duke for a note issued by Landmark. Harmon signed the indemnification agreement for Duke as his attorney-in-fact.
Harmon provided Sue and Dean Roberts with a copy of Duke's financial statement.
Investor Robert Leonard declared that Harmon showed Leonard his own financial statement and told him that Duke had a net worth of $25 million. He stated that Duke told him several times that Harmon was authorized to "sign for him."
Michael Cheesman, former employee of Harmon and Associates, testified that Harmon frequently used the financial statements and power of attorney to reassure investors that their money was "safe and secure because John Duke's wealth exceeded the assets and liabilities of `this company.'"
The question whether a defendant's conduct was a substantial contributive factor, making him a seller under the statute, is necessarily a question of fact.[18] There are genuine issues of material fact whether Duke's actionspermitting Harmon to use Duke's financial statements and his power of attorney for business purposes, as well as the other activities outlinedmake Duke a substantial contributing factor in the sales. At least four of the investors allege that they invested in Harmon's companies because of the credible assurances he was able to make that Duke backed the notes with his considerable private fortune. These facts are material and disputed.
The fact that the sales would not have taken place but for Harmon's actions does not make Duke's actions not substantial. Under Restatement of Torts (Second) § 432, Duke's actions would not be a substantial contributing factor if Harmon's actions could have caused the harm regardless of Duke's acts. The evidence in the record, taken in the light most favorable to Herrington, creates a genuine issue of material fact whether the investors would have purchased the securities if Duke had not acted as he had. There is also a genuine issue of material fact whether Duke created a force that was continuous throughout the period of the sales, and that caused the sales.[19]
For these reasons, summary dismissal of the claim that Duke may be liable under the act as a seller was incorrect. There are genuine issues of material fact to be resolved at trial on this question.

SECONDARY LIABILITY UNDER THE SECURITIES ACT
Herrington next argues that Duke is also liable under RCW 21.20.430(3) as a "control person" and "partner" of Harmon in Marvel. Because Herrington has not shown that Duke exercised actual control of the companies issuing the fraudulent securities, or that Duke had any actual authority over the sales of securities, we disagree.
At issue is the interpretation of RCW 21.20.430(3). Herrington asserts that Duke's authority to control transactions made by Marvel and his own actions that contributed to Harmon's scheme are sufficient to create "control person" liability. Duke argues that, to qualify as a control person, Duke would have to have had controlling authority in the companies that sold the securities. He is correct.
RCW 21.20.430(3) provides in relevant part that:

*573 Every person who directly or indirectly controls a seller or buyer liable under subsection (1) or (2) above, every partner, officer, director or person who occupies a similar status or performs a similar function of such seller or buyer, every employee of such a seller or buyer who materially aids in the transaction, and every broker-dealer, salesperson, or person exempt under the provisions of RCW 21.20.040 who materially aids in the transaction is also liable jointly and severally with and to the same extent as the seller or buyer, unless such person sustains the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

CONTROL PERSON
Our Supreme Court considered this statutory section in Hines v. Data Line Systems. The court reviewed federal case law interpreting the provisions in the federal statute analogous to this section. It rejected the Ninth Circuit's "culpable participation" test, which requires a finding that the defendant culpably participated in the transaction.[20] Instead, our court approved the test outlined by the Eighth Circuit in Metge v. Baehler:
plaintiffs must establish, first, that the defendant lender "actually participated in (i.e., exercised control over) the operations of the corporation in general; then he must prove that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated, but he need not prove that this later power was exercised."[21]
Our Supreme Court determined that the defendants in Hines, outside directors of the company, not only had authority to direct the company, but also actually did exercise that authority. They "had clear control over Data Line" at the time of the offering. They held a majority of the stock and each had invested substantial sums of money into the company. They actively directed and influenced the management of the company. The court decided that they exercised control of the specific activity at issue: "by virtue of their presence at board meetings where the placement memorandum was fully discussed and their knowledge of [the president's] initial surgery, [they] participated in the omission of material facts from the placement memorandum."[22]
Here, there is nothing in the record that meets the Hines test. There is nothing showing that Duke actually participated in or exercised control over the operations of the Harmon enterprises in general, other than those in which Duke held partner or shareholder status. Moreover, there is nothing to demonstrate that Duke had the actual authority to control the sales of securities at issue.
Herrington argues that Harmon effectively operated all of the businesses he was involved in as one unit, both the businesses in which Duke was involved and those in which he had no role. While this shows that Harmon was a control person in all of the businesses, it does not show that Duke was. Hines requires Duke's control, not Harmon's.
Herrington argues that the statutory language requires only that the defendant "directly or indirectly control[led] the seller." He argues that his showing that Duke "controlled" Harmon, a person who was clearly a seller, was sufficient. We disagree.
When reading a statute, we will not construe language that is clear and unambiguous, but will instead give effect to the plain language without regard to rules of statutory construction.[23] But where a statute is unclear or ambiguous, we apply rules of statutory construction to determine the *574 Legislature's intent and purpose.[24] We will construe statutes to avoid strained or absurd results.[25]
The term "seller" in this context means control of the seller in his or her capacity as a seller, as in control of the company selling securities or of the person's actions as a seller. It does not mean control of a person in some abstract or general sense.
Herrington argues that the Marvel partnership agreement makes Duke a control person for the other Harmon companies. Herrington fails to cite to any authority to support this theory. Therefore, we reject it, and do not discuss it further.[26]
Herrington also points to Duke's financial contributions to Marvel, the Marvel debt to the Harmon companies, and Duke's provision of his power of attorney and financial statements to Harmon as evidence of his control status. None of these acts demonstrate that Duke actually controlled the Harmon companies. Even Herrington's allegations that Duke attended meetings at which the sale of promissory notes was discussed do not demonstrate that he exercised actual control of the companies in which he was not a shareholder or partner. Likewise, they do not show that he had any actual authority over the sales of securities by those companies.
For these reasons, summary dismissal of the claims on the basis that the record does not support the requisite control was proper.

PARTNER OF SELLER
Herrington also argues that Duke, as Harmon's business partner in other business endeavors, is subject to partner liability under RCW 21.20.430(3). Duke argues that the statute imposes liability only on partners in the offending entity. He is correct.
The evidence of the Marvel partnership agreement shows that Duke was a partner in Marvel.[27] Herrington also asserts that Harmon introduced Duke to investors as his business partner and that these introductions suggested to the investors that Duke was a partner in the companies they invested in. Herrington implies that these facts combine to make Duke a partner in Harmon's other enterprises for purposes of this statute.
When reading a statute, we will not construe language that is clear and unambiguous, but will instead give effect to the plain language without regard to rules of statutory construction.[28] But where a statute is unclear or ambiguous, we apply rules of statutory construction to determine the Legislature's intent and purpose.[29] We will construe statutes to avoid strained or absurd results.[30]
Washington's securities fraud laws are modeled after the Uniform Securities Act.[31] RCW 21.20.430 parallels § 410 of the Uniform Securities Act (ULA).[32] A comparison of the text of ULA § 410(b) with the text of RCW 21.20.430(3) is helpful in understanding the meaning of the provision. ULA § 410(b) states:
Every person who directly or indirectly controls a seller liable under subsection (a), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale,.... [[33]]
RCW 21.20.430(3) states:
Every person who directly or indirectly controls a seller or buyer liable under subsection *575 (1) or (2) above, every partner, officer, director or person who occupies a similar status or performs a similar function of such seller or buyer, every employee of such a seller or buyer who materially aids in the transaction, ... [[34]]
While the wording of RCW 21.20.430(3) is ambiguous when taken out of context, the language of ULA § 410 more clearly shows that the term "partner" refers to a partner in the company that has sold the security at issue. A common sense reading of the phrase as a whole, "every partner, officer, director or person," also shows that the statute speaks of persons in their capacity at the issuing company. While the term "partner" may be argued to have a more general application standing alone, the terms "officer" and "director" with it place it in context. We conclude that liability under the State statute is limited to partners in the issuing company. The trial court did not err in granting summary judgment on Herrington's claims under RCW 21.20.430(3).

CIVIL CONSPIRACY
Herrington also argues that summary judgment against the civil conspiracy claim was improper because there are genuine issues of material fact regarding Duke's alleged participation. We agree.
Duke first argues that certain evidence introduced by Herrington relating to this claim is inadmissible hearsay evidence. Duke moved to strike this evidence below, and the trial court denied the motion. Duke did not cross-appeal this order. Thus, we will not address further the admissibility of this evidence.[35] Duke does challenge on appeal the admissibility of Cheesman's and Harmon's plea agreements filed in the federal cases against them. Duke did not challenge the admissibility of this evidence in the trial court, either in the motion to strike deposition testimony or in the summary judgment motion. Duke has waived this argument.[36]
A civil conspiracy exists when there is an agreement by two or more persons to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means.[37] A finding that a conspiracy exists may be based on circumstantial evidence, although the "circumstances must be inconsistent with a lawful or honest purpose and reasonably consistent only with [the] existence of the conspiracy."[38] While a finding that a conspiracy existed may be based on circumstantial evidence, mere suspicion is not a sufficient ground upon which to base a finding of conspiracy.[39] The evidence at issue must be construed in the light most favorable to the nonmoving party.[40]
Again, viewing the evidence in the light most favorable to Herrington, we note that a declaration by forensic accountant Kent W. Mordy stated that Marvel Enterprises was funded largely by investor loans passed through Harmon's enterprises. This arrangement resulted in significant tax benefits to Duke. Duke made no capital contributions or loans to Marvel from 1988 to 1996. Moody stated that, as a partner in Marvel, Duke knew or should have known how Marvel funded the losses it was incurring and how the tax benefits he was receiving were generated.
Also, Cheesman's declarations state that Duke was present at meetings in 1994 and 1995 at which the financial condition of the Harmon companies was discussed. At the 1994 meeting, Cheesman explained that investor money was being transferred to other Harmon related businesses including Marvel and that the companies' debt continued to *576 grow without any increase in assets. He recommended that the sale of notes be stopped. Cheesman further testified that Harmon responded "We cannot do that," and Duke asked, "So what can we do about this."
Cheesman also testified that he discussed financial matters relating to Harmon's businesses with Duke, that he had observed that Duke and Harmon were close friends, and that Duke was "generally familiar with the nature of the business defendants' operations."
At the 1995 meeting, Cheesman reported on the financial conditions of the companies and highlighted the amount of promissory note investment dollars received and the amount of transfers of money out to related businesses, including Marvel Enterprises. Duke did not express any surprise or voice any objection to the fact that investment dollars were continuing to be raised or that these dollars were flowing to Marvel Enterprises. There was no discussion by Duke that the promissory note sales program should be discontinued.
The record further reflects that Duke admitted that in the fall of 1995 he became aware that Harmon was "dealing with a dissatisfied investor" and later in the year began to hear about "difficulties" Harmon was having with investors and that Harmon was facing "substantial financial difficulties." Between the fall of 1995 and summer of 1996, he participated in three meetings at which these difficulties were discussed and financial solutions sought. In his deposition testimony he described a meeting with one "disgruntled" investor who was concerned about his own investment and also expressed concern that Harmon would not be able to repay other investors.
Viewing this evidence in the light most favorable to the nonmoving party, as we must, there are genuine issues of material fact. They include whether Duke knew or should have known that the tax benefits he received through Marvel were funded by the investor loans passed through Harmon's other enterprises. There is evidence that Duke knew as early as 1994 that these enterprises were incurring increasing debt with no increase in assets. He knew in the fall of 1995 that these enterprises were experiencing "substantial financial difficulties" and met with at least one investor who expressed concern about Harmon's ability to repay him and other investors. Harmon continued to sell fraudulent notes after Duke's meeting with the dissatisfied investor, and Duke took no action to prevent those sales. Duke's inaction in the face of all of this information that should have alerted him to serious problems in Harmon's businesses, including those in which he was a partner, creates a genuine issue of material fact regarding whether he agreed with Harmon to accomplish some unlawful purpose.
For these reasons, summary judgment on the conspiracy claim was improper.

ATTORNEY FEES
Herrington requests an award of attorney fees on appeal under RCW 21.20.430(1). The awardability and amount of fees shall be determined by the trial court following resolution of the underlying claims. A fee award at this juncture is premature.
We affirm the summary judgment in part and reverse in part.
Baker and Kennedy, JJ., concur.
NOTES
[1] A Ponzi scheme is "[a]n investment swindle in which high profits are promised from fictitious sources and early investors are paid off with funds raised from later ones." The American Heritage Dictionary 1407 (3d. ed.1992).
[2] CR 56(c).
[3] Mountain Park Homeowners Ass'n v. Tydings, 125 Wash.2d 337, 341, 883 P.2d 1383 (1994).
[4] Mains Farm Homeowners Ass'n v. Worthington, 121 Wash.2d 810, 813, 854 P.2d 1072 (1993).
[5] Greater Harbor 2000 v. City of Seattle, 132 Wash.2d 267, 279, 937 P.2d 1082 (1997).
[6] Mains Farm Homeowners Ass'n, 121 Wash.2d at 813, 854 P.2d 1072.
[7] 109 Wash.2d 107, 744 P.2d 1032, 750 P.2d 254 (1987).
[8] Haberman, 109 Wash.2d at 118, 744 P.2d 1032.
[9] Haberman, 109 Wash.2d at 130, 744 P.2d 1032. In Pinter v. Dahl, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), the U.S. Supreme Court adopted a strict privity analysis in construing the federal securities statute analogous to this provision. Notwithstanding that case, our Supreme Court subsequently reaffirmed its holding in Haberman. Hoffer v. State, 113 Wash.2d 148, 150, 776 P.2d 963 (1989).
[10] Haberman, 109 Wash.2d at 131, 744 P.2d 1032.
[11] Haberman, 109 Wash.2d at 131-32, 744 P.2d 1032.
[12] Haberman, 109 Wash.2d at 132, 744 P.2d 1032.
[13] Haberman, 109 Wash.2d at 132, 744 P.2d 1032.
[14] 114 Wash.2d 127, 787 P.2d 8 (1990).
[15] Hines, 114 Wash.2d at 149-50, 787 P.2d 8.
[16] Hines, 114 Wash.2d at 149-50, 787 P.2d 8.
[17] Mountain Park Homeowners Ass'n, 125 Wash.2d at 341, 883 P.2d 1383.
[18] Haberman, 109 Wash.2d at 132, 744 P.2d 1032.
[19] The parties did not argue the third factor in the Haberman test, lapse of time.
[20] Hines, 114 Wash.2d at 137, 787 P.2d 8.
[21] Metge v. Baehler, 762 F.2d 621, 631 (8th Cir. 1985).
[22] Hines, 114 Wash.2d at 141, 787 P.2d 8.
[23] Allan v. Department of Labor & Indus., 66 Wash.App. 415, 418, 832 P.2d 489 (1992).
[24] Harmon v. Dep't of Soc. & Health Svcs., 134 Wash.2d 523, 530, 951 P.2d 770 (1998).
[25] State v. Akin, 77 Wash.App. 575, 580, 892 P.2d 774 (1995).
[26] See RAP 10.3(a)(5); Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 809, 828 P.2d 549 (1992).
[27] All Marvel debt has been paid and Marvel securities are not at issue in this case. Thus, we need not decide here whether Duke was a partner in Marvel for purposes of this statute.
[28] Allan, 66 Wash.App. at 418, 832 P.2d 489.
[29] Harmon, 134 Wash.2d at 530, 951 P.2d 770.
[30] Akin, 77 Wash.App. at 580, 892 P.2d 774.
[31] Haberman, 109 Wash.2d at 125, 744 P.2d 1032.
[32] Haberman, 109 Wash.2d at 125, 744 P.2d 1032.
[33] (Italics ours.)
[34] (Italics ours.)
[35] Sunland Investments, Inc. v. Graham, 54 Wash.App. 361, 364, 773 P.2d 873 (1989).
[36] RAP 2.5(a).
[37] Corbit v. J.I. Case Co., 70 Wash.2d 522, 528-29, 424 P.2d 290 (1967).
[38] Sterling Business Forms, Inc. v. Thorpe, 82 Wash.App. 446, 451, 918 P.2d 531 (1996), review denied, 130 Wash.2d 1026, 930 P.2d 1229 (1997).
[39] Corbit, 70 Wash.2d at 529, 424 P.2d 290 (citing Cheesman v. Sathre, 45 Wash.2d 193, 273 P.2d 500 (1954)).
[40] Sterling, 82 Wash.App. at 451, 918 P.2d 531.