Arvind GOEL, Plaintiff,

v.

Naveen JAIN, Jane Doe Jain,
InfoSpace.com, Inc., and
Does 1–25, Defendants.

InfoSpace, Inc., Plaintiff,

v.

Arvind Goel, Defendant.

Nos. C01–1742L, C01–1778L.

United States District Court,
W.D. Washington,
at Seattle.

Feb. 7, 2003.

Donald H. Mullins, Duncan Calvert Turner, Badgley Mullins, John Stuart Kaplan,

Perkins Coie, Seattle, WA, for Arvind Goel, individually and on behalf of the marital community of Arvind Goel and Jane Doe Goel, InfoSpace Inc, a Delaware Corporation, plaintiffs.

Harry H. Schneider, Jr., Joseph M. McMillan, Brendyn P Ryan, Perkins Coie, Donald H Mullins, Duncan Calvert Turner, Badgley Mullins, Seattle, WA, John W. Clark, Palo Alto, CA, Brdell Ardell Johnson, Korda Johnson & Wall, San Jose, CA, for Naveen Jain, InfoSpace.com Inc, a Delaware corporation, Jane Doe Jain, Doe, 1–25, Arvind Goel, defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S REMAINING CLAIMS

LASNIK, District Judge.

This matter comes before the Court on "Defendants' Motion for Summary Judgment on Plaintiff's Claims." Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied his burden, he is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The production of "a scintilla of evidence in support of the non-moving party's position" is not sufficient. *Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir.1995). Summary judgment should be granted unless the nonmoving party offers evidence from which a reasonable jury could return a verdict in its favor. *Triton Energy,* 68 F.3d at 1221.

## FACTUAL BACKGROUND

Plaintiff's claims arise out of the acquisition of plaintiff's company, Orchest, Inc., by defendant InfoSpace, Inc. Taken in the light most favorable to plaintiff, the relevant facts are as follows.

Plaintiff met defendant Naveen Jain, the Chairman and Chief Executive Officer of defendant InfoSpace, Inc., at a conference in October 1999. The two men discussed Orchest's account aggregation process and Jain invited plaintiff to call him in the future. Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment at ¶ 4 (filed 11/12/02). Jain and plaintiff met again in January 2000, at which point they reached an agreement by which InfoSpace would acquire Orchest and its MoneyPlant product in exchange for $25 million in InfoSpace stock plus the assumption of Orchest's liabilities up to $5 million. As part of the transaction, plaintiff and some of Orchest's engineers would become InfoSpace employees. Plaintiff and Jain shook hands on the deal and Jain said "this is a deal in blood." Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment at ¶ 5 (filed 11/12/02).

Shortly thereafter, the parties entered into a written agreement pursuant to which the parties could exchange and keep confidential non-public information for purposes of evaluating the "possible strategic transaction" between Orchest and InfoSpace.[1] The January 6, 2000, agreement provides:

(7) *No Representation of Accuracy.* Each party understands and acknowledges that neither party nor any of its Representatives makes any representation or warranty, express or implied, as to the accuracy or completeness of the

---

**1.** Both parties were represented by counsel throughout the negotiations at issue in this litigation.

Evaluation Material made available by it or to it. Each party agrees that neither party nor any of its Representatives shall have any liability to the other party or to any of its Representatives relating to or resulting from the use of or reliance upon such other party's Evaluation Material or any errors therein or omissions therefrom. Only those representations or warranties which are made in a final definitive agreement regarding the Transaction, when, as and if executed, and subject to such limitations and restrictions as may be specified therein, will have any legal effect.

(8) *Definitive Agreements.* Each party understands and agrees that no contract or agreement providing for any Transaction involving the parties shall be deemed to exist between the parties unless and until a final definitive agreement has been executed and delivered....

(10) *Miscellaneous* .... No waiver, amendment, modification, consent or discharge in connection with this Agreement shall be binding upon either party unless in writing and signed by authorized representative of both parties.....

Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. B.

On January 14, 2000, the parties signed a "term sheet" which set forth the basic provisions of the proposed acquisition of Orchest by InfoSpace. The cover letter states:

The proposed terms and conditions of the Transaction set forth below are subject to completion of all necessary or advisable due diligence by InfoSpace and the execution of the Definitive Transaction Agreement. This term sheet is nonbinding except for the provisions regarding Public Disclosure, No Shop and Fees and Expenses.

Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment (filed 11/12/02), Ex. A. The term sheet provides:

— that the "parties' objective is to execute the Definitive Transaction Agreement not later than forty-five (45) days from the date of this term sheet and to close the Transaction as soon as reasonably practicable from the date of the Definitive Transaction Agreement;"

— that neither party would make any public disclosure that they were contemplating the proposed acquisition;

— that Orchest would not, directly or indirectly, solicit or encourage any competing offers for Orchest' shares or assets; and

— that Orchest's and InfoSpace's shareholders must approve the transaction prior to closing.

Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment (filed 11/12/02), Ex. A.

On January 17, 2000, plaintiff contacted Jain about working with InfoSpace's business development and technical teams to begin integrating Orchest's product into InfoSpace's network. Jain agreed, but noted that "[w]e need to sign a business deal with you so you are legally covered in case something goes wrong." Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. D. Similar exchanges occurred between plaintiff and Jeff Davis, an InfoSpace business development supervisor. Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment (filed 11/12/02), Ex. C. The parties entered into a "Marketing and Referral Agreement" in February 2000 to address InfoSpace's concerns and permit business collaboration independent of the proposed acquisition. Decl. of Joseph McMillan in Support of Defendants' Motions for Sum-

mary Judgment (filed 10/24/02), Ex. E. At about the same time, plaintiff expressed concern that the recent increase in InfoSpace's stock price would reduce the value paid for Orchest in the long run. The parties agreed to raise the purchase price from $25 million to $27.5 million. Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Exs. A at 68–69 and F.

While performing due diligence regarding the Orchest acquisition, InfoSpace employees determined that Orchest's primary technology was leased from a third party, that the lease was expensive, that Orchest had very few customers and no distribution deals, and that the technology would not be able to handle large volumes of users. Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. G. The benefit of the bargain for InfoSpace was that it would bring the company into the account aggregation market faster than it would be able to get there by itself. InfoSpace, through Jain, ultimately decided to proceed with the proposed acquisition despite the technological and logistical concerns of some employees. Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. G and H.

On March 6, 2000, Orchest and InfoSpace signed the definitive transaction agreement discussed in the term sheet (hereinafter "the March Agreement"). The March Agreement included an integration clause and set forth all of the terms and conditions of the transaction. Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. L. In particular, the agreement identified conditions which needed to occur prior to closing (such as the approval of Orchest's shareholders) and provided that InfoSpace could terminate the agreement by written notice and

payment of $1,250,000 in liquidated damages if "the Closing has not occurred by April 15, 2000; *provided, however,* that the right to terminate this Agreement under this Section 11.1(b)(i) shall not be available to any Party whose action or failure to act has been a principal cause of or resulted in the failure of the Merger to occur on or before such date and such action or failure to act constitutes a Breach of this Agreement . . . ." Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. L at 56–57.

In an effort to resolve an outstanding dispute regarding the payment of certain debts and liabilities that were on Orchest's books (but which InfoSpace believed were plaintiff's personal obligations), InfoSpace loaned plaintiff $300,000 on March 10, 2000. Plaintiff agreed to use the money "to satisfy certain obligations of Borrower and/or Orchest, Inc. . . . ." The loan was secured by an interest in plaintiff's shares of Orchest and, following the acquisition, the corresponding shares of InfoSpace. Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. M.

Throughout much of this period, InfoSpace was also investigating the possibility of acquiring another company that had an account aggregation product. Plaintiff knew that defendants' initial communications with the company, known as Security First, S1, or SOne, had broken off before plaintiff's January 4, 2000, meeting with Jain. Plaintiff was unaware, however, that contacts were reestablished in early February and that Jeff Davis had requested a meeting with Jain "to once again tee up Security First as an acquisition target." On the same day Orchest and InfoSpace signed the March Agreement, SOne presented InfoSpace with an outline of the type of deal they would like to negotiate

with InfoSpace. Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment (filed 11/12/02), Ex. R. By the end of April, InfoSpace's due diligence showed that SOne had less of a foothold with financial institutions than had originally been thought and Jeff Davis' enthusiasm for an exclusive deal with SOne had apparently waned. Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment (filed 11/12/02), Ex. S. In addition to their relatively weak strategic position, Davis noted some confusion about whether a deal with SOne would include their account aggregation product, Vertical One, which was in competition with Orchest's MoneyPlant. The original deal with SOne [2] called for InfoSpace to purchase both products, kill MoneyPlant, and bring Vertical One to market, but Davis ultimately came to believe that SOne's wireless enabled banking applications could be coupled with MoneyPlant for a winning combination. Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment (filed 11/12/02), Ex. S ("Not sure if they throw in Vertical One (original deal was that we would kill Moneyplant). Moneyplant is currently a dud and would require a lot of resources to make it worthwhile. But in the long run, if we own the wireless FIs, moneyplant would be key."). There is no indication of any further SOne-related activity after April 2000.

Within a week of signing the March Agreement, plaintiff had developed an "Integration Roadmap" to guide the integration of Orchest's employees, physical plant, business development, and technology into InfoSpace. Bob Plaschke, a member of the acquisition team, forwarded the roadmap to the necessary people at InfoSpace, stating that, "[w]hile the transaction will take a number of weeks to finalize, we can begin to start immediately integrating the Moneyplant capabilities (both the software and people) into our organization." Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. O. Orchest's servers, business operations, and four of its engineers moved into InfoSpace's California offices. Plaintiff began efforts to sell Orchest's account aggregation services on InfoSpace's behalf. Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment at ¶¶ 12–13 (filed 11/12/02). Plaintiff and Orchest's engineers signed employment agreements with InfoSpace.

Plaintiff periodically requested information regarding InfoSpace's progress in preparing for closing and a checklist of items that had not yet been completed. Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment (filed 11/12/02), Ex. E (March 10, 2000) and Ex. F (April 10, 2000). The deal did not close before April 15, 2000. Plaintiff blames the delay on InfoSpace's preoccupation with a possible SOne acquisition. Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment at ¶ 15 (filed 11/12/02). Defendants point out that plaintiff had not obtained the approval of Orchest's shareholders by April 15, 2000, which was a precondition to closing. Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. A at 123–24, Ex. L at 44.

On or about May 3, 2000, Bob Plaschke told plaintiff that InfoSpace intended to terminate the March Agreement because it had decided that the deal did not make economic sense from its perspective.

---

**2.** It is not clear from the documents whether Davis is referring to the deal that had fallen apart before Jain and plaintiff met on January 4, 2000, or whether he is referring to a plan developed in February 2000.

Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment at ¶¶ 20–23 (filed 11/12/02). Plaschke suggested doing the deal at $10 million rather than $27.5 million and/or that plaintiff could lower Orchest's liabilities by assuming its licensing obligations. Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment at ¶ 19 (filed 11/12/02). The parties were not able to work out an agreement, however, and Plaschke indicated that defendants would proceed with unwinding the deal. Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment at ¶ 20 (filed 11/12/02). InfoSpace provided a written notice of termination on May 17, 2000. Pursuant to the terms of the March Agreement, InfoSpace stated that it would "pay Orchest a termination fee in the amount of $1,250,000 by cashier's check or wire transfer and shall reimburse Orchest for transactional Expenses (as defined in the Agreement), all upon execution and delivery of appropriate documentation." Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. S. Plaintiff was asked to prepare a summary of expenses and contact InfoSpace's chief financial officer to make arrangements for reimbursement.

Plaintiff, however, was not ready to walk away from the acquisition, especially since four of his engineers were now InfoSpace employees, InfoSpace had access to all of Orchest's proprietary information, and he had made no effort to develop Orchest's business since January. Through e-mails dated May 18th and May 20th, plaintiff announced that his business development efforts were on the verge of generating $12–20 million in MoneyPlant contracts and that he would like to "work out a deal with [Jain] that makes economic sense to InfoSpace, especially in view of the above near-term revenue oppy's." Decl. of Joseph McMillan in Support of Defendants'

Motions for Summary Judgment (filed 10/24/02), Ex. T and V. After considering various options for restructuring the acquisition, InfoSpace offered to purchase Orchest's outstanding shares for $10 million worth of InfoSpace stock, with plaintiff's shares held by InfoSpace and distributed in amounts commensurate with the revenues he was able to generate over an eighteen-month period. Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment at ¶ 26 (filed 11/12/02). Although plaintiff's first response was that such an earn-out provision was a "deal-killer," he subsequently agreed to a payment of $1.25 million at closing, with the remaining shares being subject to delayed distribution based on his performance. Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment (filed 11/12/02), Exs. L and M.

Plaintiff states that Plaschke, at Jain's urging, induced plaintiff to agree to the earn-out provision by telling him that the owners of other acquisition targets were also required to earn payment of their stock over a period of time. Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment at ¶ 27 (filed 11/12/02). He also argues that InfoSpace had no intention of going forward with the $10 million deal, relying for support on the fact that he was placed under the supervision of an individual who believed Orchest's product was a "dud," favored doing a non-exclusive deal with SOne, and doubted plaintiff's ability to generate business. Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Exs. S and T.

On July 24, 2000, Orchest and InfoSpace signed the First Amended and Restated Agreement and Plan of Reorganization (hereafter, the "July Agreement"). The July Agreement contains an integration provision and expressly recites that it

amends and restates the March Agreement in its entirety. Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. W at 1 and 56. In order to obtain InfoSpace's signature on the July Agreement, plaintiff had to grant a full release of any and all claims against Jain and InfoSpace, "whether known or unknown," which plaintiff had or would have arising out of events occurring on or before the effective date of the proposed merger. Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. W at 43; Ex. X. Despite recognizing at the time that he had the option to pursue litigation over what he thought was the "illegal" termination of the March Agreement, plaintiff chose to sign the release. Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. A at 133, 135, and 162–63.

The July Agreement closed on August 4, 2000, at which time InfoSpace acquired Orchest in exchange for 255,000 shares of InfoSpace's stock. Of the approximately 180,000 shares to which plaintiff was entitled, about 120,000 were subject to the earn-out provision, another 30,000 were held in escrow by a third party for one year as security for Orchest's representations and warranties in the July Agreement, and the final 30,000 were held by InfoSpace as security for repayment of plaintiff's $300,000 loan. Plaintiff became a Vice President of Business Development at InfoSpace and drew an annual salary of $125,000 with additional stock options. At the end of the one-year escrow period, plaintiff received the 30,000 shares that had been held as security for Orchest's promises.

Soon after the closing, plaintiff and his supervisor, Jeff Davis, discussed options for renegotiating the earn-out provision. The plan was to "go full bore" toward developing strategic relationships with financial institutions, then approach Jain to negotiate an immediate disbursement of shares. Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment at ¶ 32 (filed 11/12/02); Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. AA. By December, plaintiff's efforts had not generated any new revenues or strategic deals, and he became concerned that the eighteen-month period in which he could earn the 120,000 shares was slipping away. He unsuccessfully attempted to restructure the earn-out provision with Jain and/or to obtain a three month extension of the earn-out period. Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. BB. At some point during this time, Jain came to the conclusion that plaintiff was not an asset to the company, but that any effort to terminate his employment might be complicated "because he came thru an acquisition." Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment (filed 11/12/02) at Ex. W. According to plaintiff, Jain told him that plaintiff would never be able to earn his stock "because [Jain] could always kill any deals [plaintiff] presented." Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment at ¶ 32 (filed 11/12/02).

In March 2001, plaintiff inquired whether he could earn some of his stock by identifying acquisition targets. Jain's response was unequivocal: "My deal stands as is. I have no reason or incentive to accelerate the options." Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. BB. From plaintiff's perspective, the negotiations degenerated after that. In May 2001, InfoSpace demanded payment on the $300,000 loan it had given plaintiff in March 2000. Decl. of

Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. HH. The parties discussed cancelling the July Agreement in exchange for (a) an immediate transfer of 68,000 shares (valued at $115,600) to plaintiff and/or (b) the cancellation of the $300,000 loan. When plaintiff balked, Jain walked away from the negotiations. Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. BB. InfoSpace threatened legal action to obtain repayment of the loan and had its attorneys notify plaintiff that the shares held as collateral for the loan would be sold unless payment was made. Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. HH. Plaintiff filed this lawsuit on June 14, 2001, shortly after receiving the letter from defendants' attorneys. His employment at InfoSpace ended the following year, in June 2002.

## LEGAL ANALYSIS

Plaintiff has asserted claims of fraud, unjust enrichment, violations of the Washington State Securities Act, breach of contract, misrepresentation, and violations of the Washington Consumer Protection Act. Each claim is considered below:

### A. Fraud

■ In order to prove fraud, plaintiff must establish each of the following elements by clear, cogent, and convincing evidence: (1) a representation of an existing fact; (2) its materiality; (3) its falsity; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person to whom it is made; (6) the recipient's ignorance of its falsity; (7) the recipient's reliance on the truth of the representation; (8) the recipient's right to rely upon it; and (9) consequent damages. *Farrell v. Score,* 67 Wash.2d 957, 958–59, 411 P.2d 146 (1966); *Kirkham v. Smith,* 106 Wash.App. 177, 183, 23 P.3d 10 (2001).[3] Plaintiff argues that defendant Jain's statement that the January 4, 2000, agreement was a "deal made in blood" was false because InfoSpace had no intention of going through with the deal, that defendants' insistence that the Orchest engineers sign employment agreements was a misrepresentation insofar as InfoSpace intended to "kill MoneyPlant," and that Plaschke lied when he told plaintiff that InfoSpace had a policy of imposing earn-out provisions in the context of an acquisition. Response to Defendants' Motion for Summary Judgment on Plaintiff's Claims at 5–6.

■ Plaintiff's fraud claims all arise out of statements made prior to the closing of the July Agreement. They are, therefore, subject to the release plaintiff signed in August 2000. A release is a valid and enforceable contract under Washington law unless it is "induced by fraud, misrepresentation or overreaching or if there is clear and convincing evidence of mutual mistake." *Nationwide Mutual Fire Ins. Co. v. Watson,* 120 Wash.2d 178, 187, 840 P.2d 851 (1992). Plaintiff argues that the release he signed in connection with the July Agreement is unenforceable because it was obtained through fraud. In particular, plaintiff alleges that defendants failed to adequately disclose internal conversations regarding incentive plans that might be offered to plaintiff in the future, the likelihood of plaintiff's success as an InfoSpace employee, and the structure of the

---

**3.** The Amended Complaint seeks an award of "exemplary damages" on plaintiff's fraud claim, apparently under the theory that California law applies. Under either a choice of law or contract interpretation analysis, Washington law applies to this case. Plaintiff's claim for punitive damages is hereby DISMISSED.

business development team to which plaintiff would be assigned. Response to Defendants' Motion for Summary Judgment on Plaintiff's Claims at 18. All of these discussions involved future plans or subjective opinions: none of them constitutes a false statement of existing fact.

Nonetheless, plaintiff argues that, once the parties entered into negotiations for the acquisition of Orchest, defendants had a duty to disclose everything and anything that could impact plaintiff's future employment at InfoSpace. The argument appears to be that, since a reasonable person would want to know as much about their future circumstances as possible, defendants should have disclosed all that they knew. No such duty existed, however.

> [T]he parties to an impersonal market transaction owe no duty of disclosure to one another absent a fiduciary or agency relationship, prior dealings, or circumstances such that one party has placed trust and confidence in the other. A number of factors are used to determine whether a party has a duty to disclose: (1) the relationship of the parties, (2) their relative access to information, (3) the benefit that the defendant derives from the relationship, (4) the defendant's awareness that the plaintiff was relying upon the relationship in making his investment decisions, and (5) the defendant's activity in initiating the transaction.

*Paracor Finance, Inc. v. General Elec. Capital Corp.,* 96 F.3d 1151, 1157 (9th Cir.1996). The circumstances presented here do not satisfy any of the *Paracor* factors. Plaintiff is a Wharton Business School graduate and a sophisticated businessmen. He was represented by counsel throughout the events giving rise to this litigation. The relationship of the parties was, almost from the very beginning, governed by contract. The structure of the deal was such that each side was responsi-

ble for its own due diligence and could terminate the relationship if their investigation showed that the deal was not in their best interests. Neither the documents nor the nature of the deal suggests a fiduciary relationship. Plaintiff, not defendants, pursued the possibility of an acquisition in December 1999 and defendants were not paid or otherwise compensated for acting as plaintiff's advisor. There is no indication that defendants deprived plaintiff of access to the information he now believes was necessary: he simply never asked. In short, there was no special relationship or other circumstance which would have given rise to a fiduciary or agency relationship in this case.

Plaintiff's fraud-in-the-inducement argument rests on a fourth representation, namely Plaschke's statement that "the earnout concept was a company policy that did not just apply to [Goel], but to the others, as well, whose companies had been or would be acquired by InfoSpace...." Decl. of Arvind Goel in Opposition to Defendants' Motion for Summary Judgment at ¶ 27 (filed 11/12/02). The Court will assume, for purposes of this motion, that plaintiff's recitation of this statement is accurate, that it is a statement of existing fact, and that InfoSpace had no such policy at the time. Nevertheless, the statement is not material to the release. Plaintiff believed at the time that he had been treated unfairly and had a legal claim against defendants for failing to close the March Agreement. Plaschke's statement regarding the terms of the July Agreement does not change the fact that plaintiff knowingly, voluntarily, and with the advice of counsel waived his right to sue on the March Agreement. Second, the terms offered by InfoSpace (namely that the Orchest acquisition would not proceed unless InfoSpace's obligation to transfer stock was contingent on plaintiff's ability to generate revenue) were clearly established be-

fore Plaschke attempted to justify the offer by asserting a company policy. The justification did not materially alter the nature or terms of the offer that was then on the table. Third, it is hard to understand why the outcome of InfoSpace's negotiations with unidentified third parties would be relevant in these contexts. If performance-based compensation was unacceptable to plaintiff, another individual's willingness to accept such a package should not have made the provision any more acceptable. If, on the other hand, moving forward with the acquisition was paramount to plaintiff, InfoSpace's obvious intransigence on the earn-out provision would necessitate creative negotiating on other issues, regardless of how the negotiations played out with other acquisition targets. Contrary to plaintiff's arguments, the reason for InfoSpace's intransigence, whether it was the existence of a corporate policy, a directive from Jain, or simply the whims of the negotiator, was not material to the decision whether or not to enter into the July Agreement and release all claims.[4]

The Court finds as a matter of law that the release negotiated by the parties as a condition of the July Agreement was not induced by fraud, was not the result of overreaching, and is not otherwise void or voidable. If the Court were to allow plaintiff to avoid the clear and unambiguous terms of the release, not to mention the July Agreement's integration clause,

> "contracts would not be worth the paper on which they are written." ... Plaintiff[ ] cannot overcome the written instrument here, and, particularly, the integration clause, by invoking the fraud-in-the-inducement exception to the parol evidence rule. The exception for a party who "has been induced by a fraudulent misrepresentation to enter the contact" ... must not be stretched or inflated in a way that "would severely undermine the policy of the parol evidence rule, which is grounded in the inherent reliability of a writing as opposed to the memories of contracting parties." ... We need not belabor the point. We have here the case of "a party with the capacity and opportunity

---

**4.** There is also a serious question regarding plaintiff's evidence of reliance. Although plaintiff has submitted a declaration asserting that he relied on Plaschke's statement in deciding to sign the July Agreement and release (Decl. of Arving Goel in Opposition to Defendants' Motion for Summary Judgment at ¶ 27 (filed 11/12/02)), the remainder of the record throws that contention into doubt. At his deposition, plaintiff testified that he could not say whether he would have refused to enter into the July Agreement had he known that the earn-out provision was not universally imposed. Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. A at 253–54. The difficulties arising from that testimony cannot be overcome by submitting a more helpful, but contradictory, declaration in response to a motion for summary judgment. In addition, the facts of this case, as alleged by plaintiff and as shown through the documents, suggest that plaintiff would have accepted the earn-out provision in any case.

The circumstances in which plaintiff found himself in the summer of 2000 were not good. In his zeal to begin working with defendants, plaintiff had allowed most of Orchest's assets to be integrated into InfoSpace: any attempt to unwind the deal would have been contentious and difficult. As counsel noted at oral argument on February 5, 2003, "that's where he was, Your Honor, he had nothing left ... he had no choice." The need to proceed to closing was pressing for both personal and business reasons. In addition, the concept of an earn-out provision, while distasteful and insulting to plaintiff, was not of great concern because he was confident that he would generate sufficient revenue to redeem the withheld stock. Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. A at 174–75. In such circumstances, whether the earn-out provision was imposed on all acquisition targets was of very little importance to plaintiff when he decided to proceed with the acquisition.

to read a written contract, who [has] execute[d] it, not under any emergency, and whose signature was not obtained by trick or artifice"; such a party, if the parol evidence rule is to retain vitality, "cannot later claim fraud in the inducement."

*One–O–One Enterprises, Inc. v. Caruso,* 848 F.2d 1283, 1287 (D.C.Cir.1988) (Bader Ginsberg, J.) (citations omitted). The release plaintiff signed in August 2000 is clear and its meaning is unambiguous: plaintiff gave up any and all claims against Jain and InfoSpace "arising out of any matter, cause or event occurring contemporaneously with or prior to the Effective Time of Merger" and agreed to forego all litigation on such claims. Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Ex. X. The frauds alleged by plaintiff arose out of statements made prior to the signing of the July Agreement and fall squarely within the scope of the released claims. Plaintiff is therefore contractually barred from proceeding.

### B. Unjust Enrichment

█ Unjust enrichment occurs when a person has and retains money or benefits which in justice and equity belong to another. *Bailie Communications, Ltd. v. Trend Business Sys., Inc.,* 61 Wash.App. 151, 159, 810 P.2d 12 (1991). Enrichment alone will not suffice to invoke the remedial powers of the Court. Plaintiff must also show that the enrichment was "unjust." *Farwest Steel Corp. v. Mainline Metal Works, Inc.,* 48 Wash.App. 719, 732, 741 P.2d 58 (1987).

█ Plaintiff argues that defendants obtained and kept Orchest's technology and four of its engineers for too little money. Defendants' actions were fully consistent with the contracts which governed the parties' relationship. InfoSpace satisfied all of its obligations, including the transfer of shares to Orchest's engineers, the release of certain shares to plaintiff after the one-year escrow expired, and the payment of salaries to specified Orchest employees. Assuming, for purposes of this analysis, that defendants obtained Orchest's assets and technology for less than they were worth, the resulting enrichment was in accordance with the terms of their express written contract and was in no way unjust.

### C. Washington State Securities Act

The Washington State Securities Act, RCW 21.20.010, provides:

> It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:
>
> (1) To employ any device, scheme, or artifice to defraud;
>
> (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
>
> (3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

The anti-fraud provisions of the Act apply to any sale of stock, including that which is accomplished through direct, face-to-face negotiations outside the securities market. *Aspelund v. Olerich,* 56 Wash.App. 477, 479–81, 784 P.2d 179 (1990). In order to state a claim under this provision, plaintiff must show that defendants' misrepresentations or omissions were material and were relied upon in connection with the purchase of InfoSpace's securities. *Hines v. Data Line Sys., Inc.,* 114 Wash.2d 127, 134, 787 P.2d 8 (1990). Plaintiff need not show that the misrepresentation or omission was intentional or made with reckless indifference, although a defendant may avoid liability by showing that he or she did not know, and in the exercise of rea-

sonable care could not have known, of the violation. *Burgess v. Premier Corp.*, 727 F.2d 826, 833 (9th Cir.1984); *Hines,* 114 Wash.2d at 137, 787 P.2d 8. Materiality is shown if a reasonable person would attach importance to the fact in determining his or her choice of action in the transaction. *Clausing v. DeHart,* 83 Wash.2d 70, 73, 515 P.2d 982 (1973).

■ Defendants argue that plaintiff's Securities Act claim fails because it falls within the scope of the release plaintiff signed. Pursuant to RCW 21.20.430, a person who makes a contract based on a prohibited misrepresentation or omission may not rely on that contract to support a claim. Nor may the seller of securities require the purchaser to waive compliance with the Securities Act. Although the release is technically separate from the contract for the sale of securities, it is incorporated into the July Agreement and would, if given effect, act as an impermissible waiver of the protections afforded by the Securities Act. *See Ito Int'l Corp. v. Prescott, Inc.,* 83 Wash.App. 282, 288–89, 921 P.2d 566 (1996) (choice of law provision that would allow defendant to avoid compliance with the Securities Act will not be enforced). Plaintiff's securities claim is, therefore, unaffected by the existence of the release.

■ Nevertheless, plaintiff's claim fails as a matter of law. Plaintiff argues that, in violation of RCW 21.20.010(1) and (3), defendants' conduct was part of a scheme, carried out in the normal course of defendants' business, to acquire proprietary information and employees from start-up internet businesses by falsely promising to purchase such assets at some point in the future. The premise of plaintiff's argument is that defendants never intended to go through with the acquisition of Orchest. Other than his own conjectural statements, plaintiff has not provided any evidence from which the factfinder could conclude that, as of January 4, 2000, March 6, 2000, or July 24, 2000, defendants did not intend to close the deal as contemplated on each of those dates. The fact that due diligence and the burst of the dot-com bubble made the acquisition look less attractive to InfoSpace and more attractive to Orchest as time went on does not raise any inference about their respective intents at the time the deals were struck. If anything, the evidence shows that Jain had a commitment to the deal which faded only after the individuals who had investigated the merits of the acquisition or worked with plaintiff had identified significant concerns. Plaintiff's claims under RCW 21.20.010(1) and (3) fail as a matter of law.

Plaintiff argues that defendants violated RCW 21.20.010(2) by failing to disclose the on-going negotiations with SOne, the possibility that a SOne/InfoSpace deal would involve "killing" MoneyPlant, structural changes in the business development team which would make it difficult for plaintiff to generate revenues, and the personal belief of Jeff Davis that plaintiff would not succeed at InfoSpace. Response to Defendants' Motion for Summary Judgment on Plaintiff's Claims at 9–11. Omissions are actionable under the Securities Act only if the undisclosed facts are both material and "necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." RCW 21.20.010(2). The failure to disclose details regarding InfoSpace's business development team, including the personal views of its supervisor, cannot, as a matter of law, be considered misleading in light of the disclosures that were actually made. While a reasonable person would want to know as much as possible about his or her future employment situation, the March and July Agreements are completely silent with regards to this issue. Defendants' failure to disclose everything plaintiff might want to

know about his future working conditions is not a violation of RCW 21.20.010(2).

Nor does defendants' failure to disclose InfoSpace's negotiations with SOne and the possibility that InfoSpace might choose to go to market with Vertical One rather than MoneyPlant violate RCW 21.20.010(2). The SOne negotiations had broken off prior to Jain's January 4, 2000, statement regarding a "deal in blood." At the time, Jain correctly and accurately represented the past negotiations: plaintiff does not contend otherwise. By the time those negotiations were reopened in February, the parties had signed a "term sheet" which integrated any and all prior representations. The term sheet precluded Orchest, but not InfoSpace, from soliciting other partners or deals. Plaintiff has not identified any promise of exclusivity or statement of fact which was misleading absent full disclosure of the ongoing SOne negotiations during this period. After the March Agreement was terminated and the parties began to discuss the possibility of an earn-out provision, information regarding other potential acquisitions that would have made it difficult for plaintiff to generate revenues may have been material and necessary to make the discussions not misleading. There is no evidence, however, that InfoSpace was still negotiating with SOne while the parties were hammering out the July Agreement, so there was nothing to disclose.

Finally, plaintiff maintains that defendants' misrepresentation regarding the existence of a policy requiring performance-based acquisition contracts violated RCW 21.20.010(2). Response to Defendants' Motion for Summary Judgment on Plaintiff's Claims at 11. As discussed above, however, even if the Court assumes that a misrepresentation occurred, it was not material.[5]

## D. Breach of Contract

▮ Pursuant to §§ 11.1(b)(i) and 11.2(b) of the March Agreement, InfoSpace terminated the agreement on May 17, 2000. Plaintiff has not alleged any breach prior to that date, but argues that the termination itself was "unjustified and ineffective." Response to Defendants' Motion for Summary Judgment on Plaintiff's Claims at 20. More specifically, plaintiff argues that the termination provisions of the March Agreement were never intended to allow InfoSpace to walk away from the deal after Orchest's technology and engineers had been integrated into InfoSpace.

The relationship between the parties in this litigation was, from almost the first moment, governed by contract. The individual participants were both sophisticated businessmen who were represented by counsel. For whatever reason, be it the pressures of the market, unbounded enthusiasm, or an innate work ethic, plaintiff regularly sought to accelerate performance and begin working for InfoSpace before the deal had closed. Because such efforts were not required by the agreements, defendants urged restraint until interim con-

---

**5.** In his cross-motion for summary judgment, plaintiff also argues that defendants failed to disclose the existence of an "incentive plan" in violation of RCW 21.20.010(2). Plaintiff repeatedly misrepresents this "incentive plan." It was not, as plaintiff implies, a secret plan to impose an earn-out provision or alter the nature of the deal after closing. As shown by the documents provided, InfoSpace wanted plaintiff and the four Orchest engi-

neers to relocate to Washington at some point in the future. Jain did not want to attempt to renegotiate the existing deal, but discussed the possibility of creating some sort of incentive program in the future to encourage the desired relocation. Assuming the possibility of future negotiations was material, plaintiff has not identified any statement that was misleading in the absence of this particular disclosure.

tracts could be drafted to protect Orchest's interests. Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Exs. D and E. As aptly described by plaintiff, when InfoSpace finally terminated the March Agreement, the early integration of Orchest would have made the separation difficult, but it would not have been impossible. The contractual and common law remedies available to plaintiff would have adequately protected his interests. Nevertheless, he decided to proceed with the acquisition even if it meant having to renegotiate the deal from a position of weakness. Although plaintiff ultimately agreed to a deal which was much less favorable than the original, none of these facts supports a breach of contract claim.

Plaintiff's non-specific allegation that defendants' conduct was "unjustified and ineffective" is an attempt to mask the fact that there was no actual breach. The termination provisions of the March Agreement are clear and unambiguous, and plaintiff does not contend otherwise. There is no exception or special provision in the agreement that would have prohibited early integration or that would govern the termination if plaintiff turned over all his assets earlier than contemplated under the contract. As noted above, the parties' enthusiasm to start working together made unwinding the deal more difficult, but it could have been accomplished in an orderly manner consistent with the original intent of the parties and the terms of their contracts. InfoSpace's termination of the March Agreement was accomplished in strict compliance with the terms of the March Agreement.[6] No breach has been shown.

Finally, plaintiff waived his breach of contract claim with regards to the termination of the March Agreement when he signed the release that became part of the July Agreement. At the time, he believed that InfoSpace's termination was in bad faith and illegal. Whatever claims he may have had arising out of the termination were knowingly waived. Absent fraud in the inducement, plaintiff is bound by the terms of the release.

### E. Washington Consumer Protection Act

To state a claim under the Washington Consumer Protection Act, RCW 19.86 *et seq.*, plaintiff must show: (i) an unfair or deceptive act or practice; (ii) occurring in the conduct of trade or commerce; (iii) affecting the public interest; (iv) which causes; (v) injury to plaintiff's business or property. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778, 784–85, 719 P.2d 531 (1986). Plaintiff cannot meet the public interest requirement in this case. The Washington State Securities Act, RCW 21.20.800, on which plaintiff relies for his *per se* argument, does not contain the necessary legislative declaration of public interest impact. That section identifies uniformity, not public interest, as the "general purpose" of the Securities Act. Nor has plaintiff shown advertisement, active solicitation, or inequality of

---

**6.** At one point in his "Response," plaintiff asserts that "the April 15 closing was missed because of the defendant's delays and not because of delay by Orchest." No evidence is cited in support of this contention and it is undisputed that Orchest had not obtained the necessary approval of its shareholders in a timely manner. Even if the Court were to assume that InfoSpace's actions or failure to act were "a principal cause of" the failure to close on or before April 15th, there is no evidence that "such action or failure to act constitutes a Breach of this Agreement" as required under ¶ 11.1(b) of the March Agreement. Decl. of Joseph McMillan in Support of Defendants' Motions for Summary Judgment (filed 10/24/02), Exs. L at 56.

bargaining positions. In such circumstances, there is no indication that other individuals are susceptible to the same sort of injury suffered by plaintiffs, that plaintiff is "representative of bargainers subject to exploitation and unable to protect himself," or that defendants' conduct impacted the public interest. *See Reeves v. Teuscher*, 881 F.2d 1495, 1503 (9th Cir. 1989).

For all of the foregoing reasons, defendants' motion for summary judgment on plaintiff's remaining claims is GRANTED.