# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| WILLIAM NEWCOMER, a married individual as his separate estate; WILLIAM NEWCOMER on behalf of APEX APARTMENTS, LLC, as a derivative action; 2009 NEWCOMER FAMILY, LLC on behalf of APEX APARTMENTS II, LLC and APEX PENTHOUSE CONDOS, LLC, as a derivative action, | No. 48233-9-II |
| Respondents, | |
| 2009 NEWCOMBER FAMILY, LLC, a Washington limited liability company, | |
| Plaintiff, | UNPUBLISHED OPINION |
| v. | |
| MICHAEL COHEN and JANE DOE COHEN, husband and wife, and the marital community composed thereof; MC APEX, LLC, a Washington limited liability company, | |
| Appellants, | |
| KEN THOMSEN and JANE THOMSEN, husband and wife, and the marital community composed thereof; AMC FAMILY, LLC, a Washington limited liability company, | |
| Defendants. | |

MELNICK, J. — Michael Cohen appeals a $4 million judgment in favor of William Newcomer for Cohen's violation of the Washington State Securities Act (WSSA). We conclude that the trial court did not err by denying Cohen's motion for summary judgment and motion for

directed verdict, and by entering judgment on the verdict because sufficient evidence supported the jury's verdict that Cohen violated the WSSA. We also conclude that Newcomer submitted sufficient evidence of damages, the trial court did not give an erroneous instruction on the measure of damages, and that the trial court did not erroneously enter judgement against Cohen's marital community. We affirm.

FACTS

Cohen, a general contractor and property developer, had experience developing apartment complexes and condominiums. Newcomer had experience in property investments and commercial real estate. He once owned a management company for self-service storage facilities. Newcomer and Cohen had an established business relationship.

In late 2004 or early 2005, Cohen approached Newcomer about investing in the Apex project, a large, upscale multifamily apartment complex to be built in Tacoma. The complex would consist of two buildings built in two phases: Building A or "Phase I" and Building B or "Phase II." Clerk's Papers (CP) at 1057.

I.    OFFERING INTRODUCTION

Cohen gave Newcomer a written proposal, an "Offering Introduction" (OI) that described in detail the proposed investment. Ex. 1. The OI also contained two financial documents that provided the anticipated costs and revenues for each phase.

The OI proposed that Cohen and his business partner, Ken Thomsen, would be the managing members. However, Newcomer told Cohen that he wanted to be "equal partners" with him and Thomsen. IV Report of Proceedings (RP) at 315. They agreed that Cohen, Newcomer, and Thomsen would be the principal members and each would contribute an initial capital of

2

$800,000 for a 30 1/3 percent interest in the project. Three minor investors would contribute $100,000 each.

The OI also provided that C&M Construction Management, LLC (C&M), a company owned and managed by Cohen, would "provide all management and accounting functions" for the project and would "be paid 10% of the hard costs of construction for these services." Ex. 1, at 4.

The OI stated that $350,000 of the managing members' investment would be in the form of "deferred equity." Ex. 1, at 4. The project's lender would treat the deferred equity the same as cash in underwriting the loan. The OI's financial documents also provided for the $350,000 deferred equity. They stated that the deferred equity was "[d]eveloper's [o]verhead," which was the same as construction fees. Ex. 1, at 6. Cohen believed that the OI played a "very important role" in the way capital contributions would be made. X RP at 1073.

Cohen asked for Newcomer's input on the OI's terms. Newcomer made handwritten notes to the OI regarding several changes he discussed with Cohen. Newcomer made no notes regarding the $350,000 deferred equity. However, Newcomer told Cohen that each principal member would contribute his initial $800,000 contribution in cash, not in deferred equity. According to Newcomer, Cohen agreed to exclude the deferred equity portion of the OI from the final contract. Cohen, however, denied ever telling Newcomer or other investors that his initial $800,000 capital contribution was going to be made entirely in cash.

II.    LLC AGREEMENT

Apex Apartments, LLC (Apex I) was formed on February 16, 2005, to acquire the real property and plans for the project and to develop the apartment complex. The project's final contract between the investors, "Limited Liability Company Agreement of Apex Apartments

3

L.L.C." (LLC agreement), went into effect on the same day. Ex. 2. Schedule one of the LLC agreement provided the initial capital contribution amounts for each investor:

| Member | Initial Capital Contribution |
|---|---|
| MC Apex, LLC (Michael Cohen) | $800,000 |
| AMC Family, LLC (Kenneth Thomsen) | $800,000 |
| William Newcomer | $800,000 |
| Eckstein Investments, LLC (Todd Eckstein) | $100,000 |
| Entrust Northwest, LLC (William Donahoe) | $100,000 |
| R B & F Property Management, LLC (Roger Fierst) | $100,000 |

The LLC agreement provided that "money" and "property" could be contributed and applied to a member's capital account. Ex. 2, at 12. It contained nothing about whether future services or deferred equity could comprise part of a member's capital account.

The LLC agreement also stated that Cohen would be the manager of the project. C&M would "supervise all aspects of construction" and "receive a fee equal to ten percent (10%) of [the] total project costs" for its services. Ex. 2, at 25 (schedule 3). Total project costs meant the hard costs of construction, including "site work and offsite infrastructure improvements, materials, labor, and supervision. Ex. 2, at 25 (schedule 3). Newcomer believed that C&M would get paid as the property was being constructed.

The LLC agreement required Cohen to give notice to members before requiring additional capital contributions so that members had the opportunity to make a loan if they wished. However, it allowed Cohen to use his discretion in making loans from financial institutions and his affiliate entities.

III.    CAPITAL CALL 1

On March 11, 2005, Newcomer called Cohen and asked if he put in the $250,000 portion of his initial contribution. When Cohen stated that he had, Newcomer wrote a check for $250,000. Newcomer again contacted Cohen or his accountant on May 5 and asked if Cohen and Thomsen

made their full $800,000 initial capital contribution in cash. Cohen or his accountant assured him they had. Newcomer thereafter wrote a check for $550,000 which completed his $800,000 initial capital contribution.

Cohen, however, did not contribute his $800,000 fully in cash. Instead, before construction on the project began, he credited $350,000 of deferred management fees towards his capital account. He believed that contributing deferred equity towards his capital account was an acceptable method of contributing capital towards the project. He did not inform Newcomer about the deferred equity.

Construction for Phase I began in May 2005. On May 1, Cohen executed a "Contract for Services" between Apex I and C&M for a founder's fee. Ex. 3. The document stated:

> The Members (Management) of Apex Apartments, LLC wish to compensate [Cohen] for founding and organizing this opportunity and . . . retain his additional services to provide for the independent evaluation of the performance of the staff Construction Manager and Superintendent which will supervise and direct the construction . . .

> For the services provided, [C&M] shall receive a fee of $400,000.

Ex. 3, at 1, 2.

Because Cohen managed both entities, the document only had Cohen's signature on it. According to Cohen, the $400,000 was part of a $750,000 developer fee and overhead, paid to Cohen, which the project's lender set out in the project's May 2005 construction loan agreement. The $350,000 deferred management fee accounted for the remainder of the management fee due to him, but he applied it towards his capital account. The $400,000 was not applied to Cohen's capital account; rather, it was paid to Cohen as a fee, or "cash for his services." IX RP at 999.

5

Newcomer was not aware of the "Contract for Services" when he made his initial $800,000 contribution. Nor was the contract disclosed to other investors. Newcomer did not find out about it until litigation commenced.

## IV.    CAPITAL CALL 2

Around July 2006, Cohen made a second capital call to start Phase II of the project. He requested that each principal member contribute $272,997. Shortly before making this capital call, unbeknownst to Newcomer, Cohen borrowed approximately $359,000, interest free, from Point Ruston, LLC on behalf of Apex I.[1] Point Ruston is a company that owned a large commercial and residential development in Tacoma and the City of Ruston. Cohen and Thomsen owned Point Ruston.

On August 9 or 10, Newcomer made his capital contribution for Phase II. In mid-August, Apex I issued a check and paid off the 2006 Point Ruston loan. Cohen did not disclose to Newcomer the 2006 Point Ruston loan or repayment.

## V.    CAPITAL CALL 3

By early 2008, Building A was fully occupied and the Apex project was doing well. The Apex project looked for permanent financing for Building B; however, the project's lender had gone out of business.

On February 20, 2008, Cohen, on behalf of Apex I, made a third capital call. He asked the principal members to each contribute $326,555. Newcomer made his contribution in March. At that time, Cohen had neither disclosed that Apex I borrowed money from Point Ruston nor that he did not make his initial contribution in cash. Cohen also did not disclose that shortly after Newcomer made his second capital contribution, Apex I paid off the 2006 Point Ruston loan.

---

[1] Hereafter, this transaction will be referred to as "2006 Point Ruston loan."

On March 10, Cohen formed Apex Apartments II, LLC (Apex II) to develop Phase II of the project. Apex II had the same members and percentage interests as in Apex I: Cohen acted as manager and Newcomer had a 30 1/3 percent interest in the entity.

On March 20, Cohen reorganized Apex I into two tenants-in-common (TIC) entities, Newcomer Apex I TIC, LLC (Newcomer TIC) and Apex Apartments I TIC, LLC (Apex TIC). Cohen managed both TICs. A statutory warranty deed transferred a one-third real property interest from Apex I to Newcomer TIC. The remainder of the property interest was transferred to Apex TIC. Cohen transferred Newcomer's interest in Apex I into a real property interest in Newcomer TIC, of which Newcomer became a member. All of the Apex project investors had their interest transferred into a TIC entity.

Newcomer did not receive any payment or consideration from Cohen, Apex I, or Newcomer TIC because it was "just a transfer" of his interest. V RP at 568. He believed he still owned the securities in his individual capacity. He also believed that when his interest transferred, the value of the interest remained the same. Cohen believed that the statutory warranty deed for real property was considered the "value" on the transfer. X RP at 1111.

VI.     CAPITAL CALL 4

In December 2008, an investors' meeting occurred. Newcomer expected that the members would be paid a large portion of the money they invested; instead, another capital call occurred. This capital call requested $910,000 from each principal member. Newcomer expressed his concerns, but Cohen assured him that there was a "minor setback" until the project could get financing. IV RP at 362. Newcomer contributed his $910,000 in three separate payments made in February, May, and July 2009. Even though the checks were made payable to Newcomer TIC, they were deposited into Apex I's account.

After the meeting, Newcomer learned that Point Ruston made numerous loans to the Apex project. He expressed his concerns regarding the accounting on the loans. In February 2009, Cohen's accountant told Newcomer that Cohen and Thomsen each contributed their $910,000 capital "through a reduction in the debt owed to C&M and Point Ruston from [the] Apex" project. VI RP at 726.

Further, before Newcomer made his July 2009 payment, Cohen's accountant gave Newcomer a document showing management fees earned in 2006, 2008, and 2009 that Cohen applied to his capital account. The document did not include the $350,000 deferred management fee from 2005.

In October 2009, Newcomer requested and received from Cohen's accountant a document listing the Point Ruston loans made to the Apex project. The document did not show the 2006 Point Ruston loan. Later that month, Newcomer e-mailed Cohen to express his concerns and ask for an audit, but none occurred.

By the end of 2009, Newcomer contributed a total of $2,309,552 in cash towards the Apex project:

| Newcomer's Capital Contributions | | |
|---|---|---|
| | Date | Cash |
| Capital Call 1 | 3/11/2005 | $250,000 |
| | 5/5/2005 | $550,000 |
| Capital Call 2 | 8/10/2006 | $272,997 |
| Capital Call 3 | 3/21/2008 | $326,555 |
| Capital Call 4 | 2/26/2009 | $400,000 |
| | 5/18/2009 | $410,000 |
| | 7/14/2009 | $100,000 |

On October 16, 2013, Newcomer told Cohen that he wanted out of the partnership and that he wanted his money returned. Newcomer said, "I've always had a concern about the 2008 (sic).

8

Did you actually put in your money in cash?" VI RP at 588. Cohen stated that he did, but on the second or third capital call, he used part of his capital contribution as deferred management.

At this point, Newcomer remained unaware that Cohen had not contributed his initial $800,000 contribution in cash, and that a contract existed between two Cohen-controlled entities authorizing a $400,000 founder's fee to Cohen. Newcomer also remained unaware of the 2006 Point Ruston loan and its repayment.

In the fall of 2013, Newcomer hired an attorney and inspected Apex's records. Newcomer learned that Cohen did not make his initial $800,000 capital contribution in cash and that he applied $350,000 of the contribution to his capital account as a "non-cash" deferred management fee. CP at 89.

## VII. LAWSUIT

On January 13, 2014, Newcomer sued Cohen, his wife, and their marital community. He alleged a violation of the WSSA.[2] Nobody disputed that the LLC membership interests were securities, that the WSSA governed the sale of the securities, and that Cohen controlled the sale of the securities.

The basis of his claim involved Cohen's misrepresentations that he contributed his initial $800,000 capital contribution in cash. Newcomer also alleged that Cohen's acts benefitted his marital community. Cohen denied the allegations and asserted the statute of limitations as an affirmative defense.

During the course of discovery, Newcomer learned about the $400,000 founder's fee and the 2006 Point Ruston loan. He also discovered that no written loan agreement between Apex I

---

[2] The plaintiffs alleged other causes of action but they are not at issue in this appeal.

and Point Ruston existed. The document he received in 2009 showing the Point Ruston loans only showed loans that had interest on them.

In April 2015, a California corporation purchased the Apex apartments for $26.5 million. While all loans were repaid, the investors lost their contributions. Newcomer lost his total contribution of $2,309,522.

On August 21, 2015, the trial court denied Cohen's motion for summary judgment on the WSSA claim. Cohen argued that the alleged misrepresentations or omissions were not material, the claims were barred by the statute of limitations, and no cognizable claim existed against his wife and the marital community.

The trial court ruled that a disputed material issue of fact existed as to whether any of Cohen's acts constituted a material misrepresentation or omission related to a securities transaction. It appears that the court denied the statute of limitations assertion because factual disputes existed as to when Newcomer discovered facts which gave rise to his claim. Regarding Cohen's wife, it appears that the court ruled that it would not dismiss her from the complaint because Newcomer alleged that the marital community benefitted from Cohen's actions.

At trial, the misrepresentations or omissions underlying Newcomer's WSSA claim became more defined. Newcomer testified that he would not have made his initial contribution or continued investments in the project if he had known that Cohen did not make his initial $800,000 capital contribution in cash; that in 2006, Point Ruston loaned $359,000 to Apex and repaid it days after Newcomer made his second capital contribution; and, that a contract for services between C&M and Apex I authorized a $400,000 founder's fee to Cohen.

Newcomer also testified that he sued Cohen's wife because she was "part of the whole thing." V RP at 536. He further testified that "[Cohen and his wife] were partners," that Cohen's

10

wife benefited, just as Cohen did, from the Apex project, and that "she owned half of the company." V RP at 536-37.

Newcomer's expert, W. Cary Deaton, CPA, testified that whether an investor put in cash or something other than cash was a material term that a potential investor would want to know about, regardless of the percentage of the contribution that was not in cash. Having cash available was much different than having a contribution of deferred future services. An investor would want to know about the 2006 Point Ruston loan because an investor needs this type of information to decide whether or not to make additional capital contributions to the company, knowing that the company was in debt. Deaton opined that the failure to disclose the loan constituted a material fact even if the LLC agreement allowed for the manager to borrow money at his own discretion.

After Newcomer rested his case, Cohen moved for a directed verdict. He argued that the WSSA claim as to the 2006 Point Ruston loan and the $350,000 deferred capital were barred by the statute of limitations, and that no reasonable juror could conclude that the misrepresentations or omissions were material. He also argued that Newcomer failed to show that he suffered damages, and that there was no evidence that Cohen's wife misrepresented material facts or was liable for Cohen's acts. The trial court denied the motion as to these arguments.

As to Cohen's marital community, the trial court denied the motion, ruling that sufficient evidence existed to show that Cohen and his wife were married at the time the transactions occurred and Cohen's wife benefitted from his actions.

As to damages, the trial court ruled that based on the WSSA, damages was a question for the jury. It also ruled that the jury would decide whether the alleged misrepresentations were material and whether Newcomer reasonably relied on them in purchasing the securities.

As to the statute of limitations, the court ruled that it was a "question for the jury to make a decision as to whether any of these discoveries in 2013 and 2014 were discoveries that were independent of . . . clues or history actually was known leading up to the time of discovery." IX RP at 955. It was also a question of credibility as to whether Newcomer knew about all but one Point Ruston loan and whether he would not have invested even though the loans seemed favorable to the project.

As to the 2006 Point Ruston loan and the $350,000 deferred equity, the court denied the motion and appeared to rule that sufficient evidence existed that the failure to disclose those facts constituted a material omission.

As to Cohen's arguments that payments made after capital call 2 in 2006 that were attributed to Phase II of the Apex project should be dismissed, the court denied the motion because, viewing the facts most favorable to Newcomer, the organization of the Apex project was in two buildings and Newcomer's initial investment was projected to be applied towards the two buildings.

At the close of trial, the court instructed the jury on the measure of damages. The instruction reflected the WSSA statute governing remedies. RCW 21.20.430(1). Cohen argued that there was insufficient evidence to support the instruction and excepted to it.

The trial court also instructed the jury on the elements of liability under the WSSA, materiality, reasonable reliance, and the statute of limitations.

VIII.   JURY VERDICT AND JUDGMENT ON THE VERDICT

On September 21, 2015, the jury entered a special verdict in Newcomer's favor. It awarded Newcomer recessionary damages of $2,309,552—the total amount in capital contributions he made to the Apex project. The verdict form stated:

1.      Did Plaintiff file this lawsuit within the statute of limitation applicable to the [WSSA]?

⊠ **Yes. Proceed to question 2.**

. . . .

2.      Did Defendants make a material misrepresentation or omission reasonably relied on by Plaintiff in connection with the 2005 sale of Securities to Plaintiff in the amount of $800,000 in violation [of] the [WSSA]?

⊠ **Yes . . . The amount of damages, if any, we award are $800,000.**

. . . .

3.      Did Defendants make a material misrepresentation or omission reasonably relied on by Plaintiff in connection with the 2006 sale of Securities to Plaintiff in the amount of $272,997 in violation [of] the [WSSA]?

⊠ **Yes . . . The amount of damages, if any, we award are $272,997.**

. . . .

4.      Did Defendants make a material misrepresentation or omission reasonably relied on by Plaintiff in connection with the 2008 sale of Securities to Plaintiff in the amount of $326,555 in violation [of] the [WSSA]?

⊠ **Yes . . . The amount of damages, if any, we award are $326,555.**

. . . .

5.      Did Defendants make a material misrepresentation or omission reasonably relied on by Plaintiff in connection with the 2009 sale of Securities to Plaintiff in the amount of $910,000 in violation [of] the [WSSA]?

⊠ **Yes . . . The amount of damages, if any, we award are $910,000.**

CP at 1660.

In October, the trial court entered a judgment on the verdict. Judgment was entered against

Cohen and the marital community:

| E. | Principal Judgment Amount | $2,309,552.00 |
| F. | Interest to Date of Judgment[3] | $1,534,614.21 |
| G. | Attorney's Fees[4] | $193,461.75 |
| H. | Costs | $23,359.50 |
| **I.** | **TOTAL JUDGMENT** | **$4,060,987.46** |

CP at 1805.

Cohen appeals.

## ANALYSIS

I. LEGAL PRINCIPLES[5]

We review summary judgment orders de novo. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). "Summary judgment is appropriate only when no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law." *Keck*, 184 Wn.2d at 370 (footnote omitted); CR 56(c). However, "[w]hen a trial court denies summary judgment due to factual disputes, . . . and a trial is subsequently held on the issue, the losing party must appeal from the sufficiency of the evidence presented at trial, not from the denial of summary judgment."[6] *Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 35 n.9, 864 P.2d 921 (1993).

---

[3] Newcomer moved for prejudgment interest at 8 percent per annum from the date of payment of the purchase of the security through October 2, 2015, pursuant to RCW 21.20.430. The parties stipulated to the prejudgment interest amount.

[4] Attorney fees were calculated based on Newcomer's separate motion for attorney fees and costs pursuant to RCW 21.20.430. The trial court entered findings of fact and conclusions of law, and awarded fees and costs less than what Newcomer proposed.

[5] The parties dispute the standard of review we should utilize on the various issues.

[6] It is clear from the record that the trial court denied summary judgment because it believed issues of material fact existed. For that reason, we do not consider or address summary judgment arguments any further.

We review a trial court's decision to deny a motion for directed verdict under the same standard as the trial court. *Stiley v. Block*, 130 Wn.2d 486, 504, 925 P.2d 194 (1996). A directed verdict is proper if, when the material evidence is viewed in the light most favorable to the nonmoving party, the court can say, as a matter of law, that there is no substantial evidence or reasonable inferences to sustain a verdict for the nonmoving party. *Indust. Indem. Co. of the Nw., Inc. v. Kallevig*, 114 Wn.2d 907, 915-16, 792 P.2d 520 (1990).

However, on appeal, the inquiry is limited to whether the evidence, when viewed in the light most favorable to the non-moving party, was sufficient to sustain the jury's verdict. *Indust. Indem. Co.*, 114 Wn.2d at 916. "[U]nder the sufficiency of the evidence standard . . . '[t]he record must contain a sufficient quantity of evidence to persuade a rational, fair-minded person of the truth of the premise in question.'" *Winbun v. Moore*, 143 Wn.2d 206, 213, 18 P.3d 576 (2001) (quoting *Canron, Inc. v. Fed. Ins. Co.*, 82 Wn. App. 480, 486, 918 P.2d 937 (1996)). Denial of a motion for directed verdict is inappropriate only if it is clear that the evidence and reasonable inferences are insufficient to support the jury's verdict. *Indust. Indem. Co.*, 114 Wn.2d at 916.

II.     STATUTE OF LIMITATIONS

Cohen first argues that the trial court erred by denying his motion for directed verdict on whether the statute of limitations barred Newcomer's claims because Newcomer was on inquiry notice, at the latest, by 2009. We conclude that whether the statute of limitations barred Newcomer's claims was a question of fact for the jury, and sufficient evidence supported the jury's finding that Newcomer timely filed his lawsuit.

"The determination of when a plaintiff discovered or through the exercise of due diligence should have discovered the basis for a cause of action is a factual question for the jury." *Winbun*, 143 Wn.2d at 213. We review factual determinations under a sufficiency of the evidence standard,

that is, evidence to persuade a fair minded person of the truth of the declared premise. *Miller v. City of Tacoma*, 138 Wn.2d 318, 323, 979 P.2d 429 (1999).

At trial, the court instructed the jury on the statute of limitations for WSSA claims:

> If one has notice of facts sufficient to prompt a person of average prudence to inquire further, the person is deemed to have notice of all facts which reasonable inquiry would disclose . . .

> Plaintiff has the burden of proof to show that he did not discover, or with exercise of reasonable care could not have discovered, the facts giving rise to his claims three years before January 13, 2014.

CP at 1653 (Instr. 14); RCW 21.20.430(4)(b).

Cohen does not argue that the instruction was an incorrect statement of law or that the trial court otherwise erred by giving the instruction. "Unless there is a proper objection, jury instructions become the law of the case." *Millies v. LandAmerica Transnation*, 185 Wn.2d 302, 313, 372 P.3d 111 (2016) (footnote omitted). We, therefore, review the sufficiency of the evidence in light of the instructions given. *Millies*, 185 Wn.2d at 313.

Here, the trial court properly denied Cohen's motion for directed verdict on the statute of limitations because the issue posed a question of fact. The facts before the jury supported its verdict that Newcomer filed his lawsuit within the statute of limitations.

The jury heard that Newcomer repeatedly inquired of Cohen who repeatedly failed to disclose that his initial $800,000 capital contribution was not fully made in cash. Cohen continued to misrepresent the character of his initial capital contribution as late as the fall of 2013, after Newcomer hired an attorney to investigate.

The jury also heard that Cohen failed to disclose the 2006 Point Ruston loan which Cohen made weeks before Newcomer made his second capital contribution. In 2009, Newcomer received an accounting document of Point Ruston loans, but it excluded the interest-free loan at issue.

Cohen failed to disclose that information until after litigation commenced. The jury also heard evidence that Newcomer and other investors had no knowledge or notice of the $400,000 founder's fee until the parties were in discovery. The fact that Cohen presented contrary evidence does not mean that insufficient evidence supports the jury verdict.[7]

Whether Newcomer timely filed this lawsuit was a factual question properly before the jury, which ultimately found in his favor. Based on the evidence presented at trial, we conclude that sufficient evidence existed to persuade a rational, fair-minded person that Newcomer filed his lawsuit within the statute of limitations.

III.    MATERIALITY AND RELIANCE

Cohen next argues that the trial court erred by denying his motion for directed verdict and in entering judgment on the verdict because no reasonable juror could conclude that the misrepresentations or omissions at issue were material or reasonably relied upon.[8] We conclude that sufficient evidence supported the jury's finding that Cohen made material misrepresentations or omissions and Newcomer reasonably relied on them.

Under the WSSA, "[i]t is unlawful for any person, in connection with the offer, sale or purchase of any security. . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." RCW 21.20.010(2). The violation is the

---

[7] We do not review a jury's credibility determinations. *Kohfeld v. United Pac. Ins. Co.*, 85 Wn. App. 34, 42, 931 P.2d 911 (1997).

[8] Cohen, citing to RCW 25.15.190, also argues that the Limited Liability Companies Act allows for capital contributions to be made in services rendered. The argument is misplaced. At issue is whether there were material misrepresentations or omissions that were reasonably relied upon by a reasonable investor. That the form of the contribution was not in cash, or that a contribution in deferred equity was not necessarily a bad act, is not pertinent to a WSSA claim. We also note that RCW 25.15.190 was repealed. LAWS OF 2015, ch. 188 § 108, eff. January 1, 2016.

17

misrepresentation or omission itself. *Hines v. Data Line Sys., Inc.*, 114 Wn.2d 127, 135, 787 P.2d 8 (1990). The WSSA also requires reliance upon the alleged misrepresentations or omissions. *Hines,* 114 Wn.2d at 134.

At trial, the court instructed the jury on materiality:

A material fact is a fact to which a reasonable person would attach importance in determining his or her decision whether to purchase the security, or a fact that would affect the desire of reasonable investors to buy the company's securities. There is an ongoing duty to disclose material facts that relate to the specific security originally purchased.

For an undisclosed fact to be material, there must be a substantial likelihood that the disclosures of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.

CP at 1647 (Instr. 8).

The trial court also instructed the jury on reasonable reliance as applicable to both misrepresentations and omissions:

In making a determination whether one reasonably relies on a representation in connection with the purchase or sale of a security, you should consider: (1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long-standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentation.

CP at 1649 (Instr. 10).

If Defendants omitted to disclose a material fact, Plaintiff does not need to prove reliance on an omission because it is presumed. Such presumption can be overcome if Defendant shows that Plaintiff's decision would have been unaffected even if the omitted fact had been disclosed.

CP at 1648 (Instr. 9).

Cohen does not argue that the instructions contained incorrect statements of law or that the trial court otherwise erred by giving the instructions. Therefore, they are the law of the case.

*Millies*, 185 Wn.2d at 313. We review the sufficiency of the evidence in light of the instructions given. *Millies*, 185 Wn.2d at 313.

Here, the trial court denied Cohen's motions directed verdict because factual disputes existed as to the materiality of the misrepresentations or omissions and whether Newcomer reasonably relied on them. Sufficient evidence existed to support the jury's findings on these issues.

The jury heard expert testimony that the form of Cohen's initial capital contribution, e.g. cash vs. non-cash, was a material fact that a reasonable person would want to know about prior to investing. Newcomer testified that he would not have invested or continued to invest had he known about the $350,000 deferred equity, the 2006 Point Ruston loan, or the $400,000 founder's fee. The LLC agreement did not address whether deferred fees for future services was an acceptable form of capital contribution.

Regarding the 2006 Point Ruston loan, the jury heard that although Cohen could borrow money on behalf of Apex without notice, the salient inquiry was whether Apex had an undisclosed debt and whether a reasonable person would want to know about it before investing. The jury also heard that an investor would want to know about the loan because the company's debt would assist an investor in deciding whether or not to make additional capital contributions.

Based on the evidence presented at trial, we conclude that sufficient evidence existed to persuade a rational, fair-minded person that Cohen made material misrepresentations or omissions, and that Newcomer reasonably relied on them when making his capital contributions.

III.     REMEDIES

Cohen next argues that the trial court erred as a matter of law when it instructed the jury that it could award recessionary relief or damages when the evidence showed that only damages were available.[9] We conclude that the trial court did not err.

We review a trial court's decision to give a jury instruction de novo if based upon a matter of law, or for abuse of discretion if based upon a matter of fact. *Kappelman v. Lutz*, 167 Wn.2d 1, 6, 217 P.3d 286 (2009). Whether to give a certain jury instruction is within the trial court's discretion and is, therefore, reviewed for an abuse of discretion. *Christensen v. Munsen*, 123 Wn.2d 234, 248, 867 P.2d 626 (1994). "The propriety of a jury instruction is governed by the facts of the particular case." *Fergen v. Sestero*, 182 Wn.2d 794, 803, 346 P.3d 708 (2015). Jury instructions are sufficient if they are "supported by the evidence, allow each party to argue its theory of the case, and when read as a whole, properly inform the trier of fact of the applicable law." *Fergen*, 182 Wn.2d at 803.

---

[9]     In the alternative, Cohen argues that the award should be modified or reduced because by the time Newcomer made his 2008 and 2009 contributions, the misrepresentations or omissions made in 2005 and 2006 were immaterial. He argues that even if they were material, each of the misrepresentations or omissions occurred in connection with Newcomer's investment in Apex I. He further argues that no evidence or argument was adduced to support treating Apex I and the TIC entities (formed in 2008) as a single entity.

We employ the same sufficiency of the evidence standard as to these arguments because the jury found, as to each of Newcomer's four capital contributions, that Cohen was liable under the WSSA. At trial, the jury heard evidence regarding the restructuring of the entities and circumstantial evidence showing that Newcomer's checks in 2009 were made towards the Apex project as though it was a single project managed by Cohen. The jury also heard evidence that in 2009, Cohen provided Newcomer with a document that omitted Cohen's $350,000 contribution in deferred equity, an omission which Newcomer relied on in making his last payment towards his $910,000 contribution. Because sufficient evidence supported the jury's findings, we decline to modify or reduce the judgment.

At trial, the court instructed the jury:

> If you find for Plaintiff on the claims under the [WSSA], then you must determine the amount of damages, if any. If the Plaintiff still owns the security, the damages are the amount Plaintiff paid in connection with the purchase of the security. Plaintiff is not required to show that the untrue statement or omission actually caused them to incur losses.

> If the Plaintiff no longer owns the security, the amount of damages are the amount for which the security was initially purchased less the value of the security when Plaintiff disposed of it.

CP at 1654 (Instr. 15); RCW 21.20.430(1).

Cohen does not argue that the instruction is an incorrect statement of the law. Instead, he argues that the trial court should have instructed the jury only on the calculation of damages. He argues that the evidence showed that Newcomer disposed of his securities; therefore, damages was the only remedy available. Cohen's argument is unpersuasive.

The trial court's instruction allowed both parties to argue their theories of the case. Newcomer presented evidence that he did not dispose of his security interest in Apex and that, at all times, he personally owned his securities. The jury also heard that Newcomer did not receive any payment or consideration for the transfer.

Cohen presented evidence that Newcomer personally purchased the securities, but subsequently transferred them to distinct entities for an interest in real property, thereby "dispos[ing]" of his securities. XI RP at 1186. Recognizing the differing evidence, the trial court gave an instruction that allowed the jury to calculate the remedy in two different ways.

Given that the jury heard contrary evidence as to whether or not Newcomer owned or disposed of his securities, the trial court properly instructed the jury. We conclude that the trial

21

court did not err because the instruction was supported by the evidence, it allowed each party to argue its theory of the case, and it properly informed the jury of the applicable law.[10]

IV.     JUDGMENT AGAINST THE MARITAL COMMUNITY

Cohen next argues that the trial court erred by entering judgment against Cohen's marital community because the court based its decision solely on the fact that Cohen and his ex-wife were married when the events at issue took place, no evidence showed that she could be held liable under the WSSA, and the question of community liability was never submitted to the jury. We conclude that the trial court did not err.

Once a jury renders a verdict, the trial court must declare its legal effect and enter a judgment upon it where appropriate. *McRae v. Tahitian, LLC*, 181 Wn. App. 638, 644, 326 P.3d 821 (2014). A court liberally construes a verdict so as to discern and implement the jury's intent, if consistent with the law. *McRae*, 181 Wn. App. at 644. A court may view a verdict in light of the jury instructions and trial evidence. *Meenach v. Triple "E" Meats, Inc.,* 39 Wn. App. 635, 638-39, 694 P.2d 1125 (1985).

"A debt incurred by either spouse during marriage is a community debt." *Trinity Universal Ins. Co. of Kansas v. Cook*, 168 Wn. App. 431, 437, 276 P.3d 372 (2012). The presumption may be overcome only by clear and convincing evidence. *Oil Heat Co. of Port Angeles, Inc. v. Sweeney*, 26 Wn. App. 351, 353, 613 P.2d 169 (1980). "The key test is whether,

---

[10] Cohen also argues that Newcomer's attorney improperly told the jury that that proper measure of damages was a "trick" and encouraged the jury to apply the wrong standard, thereby compounding the prejudice caused by the erroneous jury instruction. Br. of Appellant at 61. We do not consider the argument because it was not properly preserved below  *Collins v. Clark County Fire Dist. No. 5*, 155 Wn. App. 48, 97, 231 P.3d 1211 (2010); RAP 2.5(a).

at the time the obligation was entered into, there was a reasonable expectation the community would receive a material benefit from it." *Sunkidd Venture, Inc. v. Snyder–Entel*, 87 Wn. App. 211, 215, 941 P.2d 16 (1997). Actual benefit to the community is not required as long as an expectation of community benefit existed. *Oil Heat*, 26 Wn. App. at 355.

The parties disputed whether Cohen's acts benefited the marital community and argued the community liability issue to the jury. Newcomer testified that he named Cohen's ex-wife as a party in this lawsuit because she was "part of the whole thing" and that Cohen and his ex-wife were "partners." V RP at 536. He also testified that Cohen's ex-wife owned half of the company and "benefited, just as [Cohen] did, from the Apex Apartments." V RP at 537.

In support of his argument, Cohen cites to *Swenson v. Stoltz*, 36 Wn. 318, 78 P. 999 (1904). In *Swenson*, the complaint alleged and the answer denied that the husband's obligation was for the benefit of the marital community. 36 Wn. at 324. The court held that the judgment against the marital community was not in conformity with the verdict because the trial court only instructed the jury on the husband's personal liability, and not on the community liability issue. *Swenson*, 36 Wn. at 324.

This case is distinguishable from *Swenson* because, although the trial court did not specifically instruct the jury on community liability, the parties argued the issue to the jury and the jury had to decide the culpability or non-culpability of each defendant. The jury heard that Cohen's ex-wife owned half of the company and benefitted from Cohen's actions; therefore, recovery should be made against her and the martial community. The special verdict form referred to "defendants," meaning that the jury had to make findings of liability as to both Cohen and his ex-wife. Given the evidence, the court liberally construed the jury verdict and implemented the jury's intent.

23

Further, Cohen presented no evidence showing that his acts did not benefit the marital community. Cohen did not object or take exception to the jury instructions on this point. He also did not object when the trial court entered the judgment on the verdict which specified that he and his ex-wife were the judgment debtors.

Based on the evidence and the special verdict form that specified Cohen and his ex-wife as "defendants" in the lawsuit, the trial court properly entered judgment against the marital community.

V.    ATTORNEY FEES

Lastly, Newcomer requests an award of reasonable attorney fees and costs as the prevailing party on appeal.

A prevailing part may recover attorney fees authorized by statute. *Landberg v. Carlson*, 108 Wn. App. 749, 758, 33 P.3d 406 (2001). The WSSA provides for such an award to a defrauded investor who prevails on his or her claim. RCW 21.20.430(1). Generally, if such fees are allowable at trial, the prevailing party may recover fees on appeal as well. *Landberg*, 108 Wn. App. at 758; RAP 18.1. Because the WSSA statute authorizes the prevailing party to recover reasonable attorney fees, we award Newcomer attorney fees and costs incurred in this appeal.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Johanson, P.J.

_____
Sutton, J.